1  FRANK N. DARRAS #128904
2  Email: fdarras@sbd-law.com
   LISSA A. MARTINEZ #206994
3  Email: lmartinez@sbd-law.com
4  SHERNOFF BIDART & DARRAS, LLP
   3257 East Guasti Road, Suite 300
5  Ontario, CA 91761
6  Telephone: (909) 390-3770
   Facsimile: (909) 974-2121
7

8  Attorneys for Plaintiff
9  CARI GARRISON

10

11              UNITED STATES DISTRICT COURT

12             CENTRAL DISTRICT OF CALIFORNIA

13

| CARI GARRISON, | Case No.: CV07-3094 JFW(Ex) |
|---|---|
| Plaintiff, | **PLAINTIFF'S OPENING TRIAL BRIEF** |
| vs. | |
| AETNA LIFE INSURANCE COMPANY; THE BOEING COMPANY EMPLOYEE HEALTH AND WELFARE BENEFIT PLAN, | Judge: Hon. John F. Walter<br>Date: February 26, 2008<br>Time: 8:30 am<br>Ctrm: 16 |
| Defendants. | |

24      Plaintiff, Cari Garrison, hereby submits the following Opening Trial Brief in

25  the above matter.

26

27

28

SHERNOFF BIDART DARRAS
LAWYERS FOR INSURANCE POLICYHOLDERS
600 S INDIAN HILL BLVD CLAREMONT CA 91711 TEL 909 621 4935

# I.   INTRODUCTION

Plaintiff Cari Garrison worked for Boeing for 23 years prior to becoming disabled due to degenerative disk disease, chronic pain and side-effects of narcotic pain medications.  She was the Director, Supplier Management for Boeing's Future Combat Systems – a position that required long hours, significant travel and high-level analytical and problem solving abilities.

Aetna initially approved Ms. Garrison's claim for LTD benefits, but then arbitrarily denied the claim contending that Ms. Garrison was no longer disabled from her own occupation because she could perform "sedentary" work.  In so doing, Aetna failed to consider Ms. Garrison's complaints of chronic pain, fatigue and the side-effects of her numerous pain medication, focused instead on objective evidence, and changed the classification of her occupation from "light" to "sedentary" by improperly considering work-place accommodations.  A review of the administrative record leaves no doubt that Ms. Garrison is totally disabled from performing her occupation and Aetna's denial was arbitrary and capricious.

# II.   STATEMENT OF FACTS

## A.   The Plan

Ms. Garrison was insured under Boeing's Life and Disability Plan, an employer sponsored benefit insured by Aetna Group Life and Long Term Disability Insurance Policy GP-728777 (the "Plan").  (Ex. A, 1-45.)[1]  The Plan provides LTD benefits after a 26 week Waiting Period (during which STD benefits are paid), in an amount equal to 50% of monthly predisability earnings, less any amounts received from other sources such as state disability, Social Security or Workers Compensation.  Benefits are payable until the claimant's normal

---

[1].  Citations to supporting evidence are made to the Administrative Record previously lodged by defendants in this case, with the omission of the prefix "AET."  To assist the Court in its review, referenced documents are contained in

SHERNOFF BIDART DARRAS
LAWYERS FOR INSURANCE POLICYHOLDERS
600 S INDIAN HILL BLVD  CLAREMONT CA 9711  TEL 909 621 4935

1  retirement age, which in Ms. Garrison's case is age 66.  (Ex. A, 42-43.)

2      The Plan defines total disability during the first 30 months as the inability

3  "to perform the material duties of your own occupation; except that if you start

4  work at a reasonable occupation you will no longer be deemed totally disabled."

5  After the first 30 months, total disability means the inability "to work at any

6  reasonable occupation."  (Ex. A, 26.)  Reasonable Occupation is defined as "any

7  gainful activity for which you are, or may reasonably become, fitted by education,

8  training, or experience."  (Ex. A, 26.)  The Plan does not define own occupation;

9  nor does it contain an "objective" evidence requirement.  (Ex. A, 1-45.)

10     **B.    Ms. Garrison's Pre-Disability Occupation**

11     A review of Ms. Garrison's resumé paints a very clear picture of a highly

12  motivated and professionally successful woman.  Ms. Garrison never envisioned

13  herself as someone relying on disability benefits for financial sustenance.

14     Ms. Garrison was employed with Boeing for approximately 23 years.  Due

15  to her demonstrated dependability, dedication, strong leadership skills, the

16  consistent quality of her work and her ability to "think outside of the box," she was

17  promoted several times, selected to participate in a number of programs for future

18  executives (including the Lead and High Potential Programs) and received a

19  number of achievement awards, including stock options, stock certificates,

20  performance bonuses and certificates. (Ex. C, 456-457.)

21     Prior to her disability, Ms. Garrison was the Director of Supplier

22  Management for the FCS [Future Combat Systems] Program, which remains the

23  largest Boeing program, worth several billion dollars.  Ms. Garrison's position

24  required long hours, significant travel, and high-level analytical and problem

25  solving abilities.  She was asked to lead a project that neither Boeing nor the Army

26  had ever done before.  It involved a completely new way of doing business, pulling

27  _____

28  the Exhibit Binder and submitted herewith as Exhibits to the accompanying
    Declaration of Lissa A. Martinez.

SHERNOFF BIDART DARRAS
LAWYERS FOR INSURANCE POLICYHOLDERS
600 S INDIAN HILL BLVD  CLAREMONT CA 9171   TEL 909 621 4935

PLAINTIFF'S OPENING TRIAL BRIEF

SHERNOFF BIDART DARRAS
LAWYERS FOR INSURANCE POLICYHOLDERS
600 S INDIAN HILL BLVD CLAREMONT CA 9171  TEL 909 621 4935

1   together some 750 individuals, and managing a simultaneous multi-source

2   selection process with subcontract management locations in California, Alabama,

3   Washington, Florida and Pennsylvania.  It required working seven days a week for

4   months, generally 12-16 hour days, with frequent travel.  Ms. Garrison got the job

5   done, but it took a toll on her physically, requiring the daily use of Vioxx and

6   Vicodin.  Her managers knew she was in pain and tried to accommodate her as

7   much as possible by holding meetings in her office, allowing her to change

8   positions frequently, and traveling for her whenever possible.  (Ex. C, 456-460.)

9       Ms. Garrison ceased working as of January 29, 2004 to undergo back fusion

10  surgery due to disc herniation and symptoms of low back pain, degenerative disc

11  disease of the lumbar spine and radiculitis.  At the time, her annual base salary was

12  $138,300.  (Ex. B, 49.)

13  ## C.    Ms. Garrison's Disabling Medical Condition

14      Ms. Garrison had a ten year history of back pain prior to undergoing this

15  fusion surgery.  She had previously tried chiropractic treatment, physical therapy,

16  epidural injections and medications.  In April of 2001, she underwent a

17  microdiscectomy, which provided only short-term relief.  (Ex. C, 457.)

18      In September of 2003, Ms. Garrison sought treatment from Dr. Steven

19  Dennis, board-certified Orthopedic Surgeon, who recommended she undergo

20  fusion surgery.  On January 29, 2004, Ms. Garrison underwent an anterior lumbar

21  interbody fusion L3-L5, with interior screws, and posterior decompression at L3-

22  L5, with discectomy at L4-L5.  The risks and complications of this complex

23  surgery include nerve injury, chronic pain and disability.  (Ex. Q, 539-540.)  A

24  solid fusion does not guarantee freedom from pain nor the ability to return to

25  normal activity.  And, unfortunately, Ms. Garrison obtained neither.

26      Although Ms. Garrison reported improvement in her back pain after surgery,

27  she experienced excruciating left leg pain, which was attributed to the nerve being

28  stretched during surgery to accommodate a new larger spine – she was ¾ inch

PLAINTIFF'S OPENING TRIAL BRIEF

1 taller after the fusion surgery. In spite of her best efforts, Ms. Garrison's leg pain

2 never resolved. (Ex. C, 458.)

3     **D.**    **Ms. Garrison's Disability Claim**

4     On February 3, 2004, Aetna confirmed that Ms. Garrison's claim for STD

5 benefits had been approved. (Ex. F, 52-54.) Aetna ultimately paid STD benefits

6 through July 28, 2004 (the maximum benefit period) before it referred her claim to

7 an LTD analyst for review. (Ex. F, 69-70.)

8     **1.**    **Ms. Garrison's Occupational Duties**

9     On February 13, 2004, Ms. Garrison's supervisor completed a Physical

10 Demand Analysis indicating that her position as a Director, Supply Management,

11 FCS requires "continuous" (67-100% or 5.1-8 hrs per day) sitting; "occasional" (1-

12 33%) climbing, kneeling, lifting, pulling, reaching above shoulder level, forward

13 reaching, carrying, bending, twisting, hand grasping, gross manipulation, standing,

14 stooping, and walking; "occasional" (1-33%) lifting up to 20 lbs; 80% of the day

15 spent on the phone and computer; a usual work shift was 12 hours; and overtime

16 was required. (Ex. B, 56.) Aetna was also given Ms. Garrison's job description:

17 "Perform responsibilities requiring the integration of disciplines from more than

18 one supplier management and procurement job family and applied independent,

19 specialized technical expertise to support a wide range of business objectives.

20 Activities include, but are not limited to, the development, integration,

21 implementation, and execution of multidisciplinary business processes. Works

22 cross-functionally with internal and external customers and suppliers and all

23 employee levels to carry out responsibilities." (Ex. B, 58.)

24     On May 6, 2004, Ms. Garrison informed Aetna that her job requires travel

25 and fourteen hour days. (Ex. T, 666.) This was confirmed on June 17, 2004

26 during the Initial Telephone Interview as Ms. Garrison explained that "she would

27 work 14 hour days and on her last project she worked 7 months w/o a day off ...

28 Her occ required a lot of travel as well." (Ex. T, 689-693.)

SHERNOFF BIDART DARRAS
LAWYERS FOR INSURANCE POLICYHOLDERS
600 S INDIAN HILL BLVD CLAREMONT CA 91711 TEL 909 621 4935

PLAINTIFF'S OPENING TRIAL BRIEF

As part of her claim documentation, Ms. Garrison completed a "Work History and Education Questionnaire" on June 28, 2004. She indicated that as a Director, FCS Supplier Management, her duties and responsibilities include: "Management of all FCS Supplier Mgmt activities contained in numerous locations throughout the US. FCS is the largest program within Boeing with huge demands to perform ... position requires long hours, significant travel in an extremely high stress environment." She also indicated that she is "unable to travel or work excessive hours; unable to remain in one position for more than 30 minutes [and] frequently needs to lie down." She is "still experiencing significant pain in lower back & left leg. Daily fatigue & pain would prevent even an 8 hr. day." (Ex. B, 72-73.)

## 2. Ms. Garrison's Physicians Confirm Disability

On June 8, 2004, Dr. Dennis completed an Attending Physician's Statement ("APS") certifying Ms. Garrison's total disability, with the diagnosis: 1) DDD [Degenerative Disc Disease] of the Lumbar Spine; 2) Radiculitis; 3) Spondylolisthesis. He documented subjective symptoms of "severe low back pain" and objective findings of "X-rays and MRI" showing "DDD, stenosis and HNP." He prescribed Vicodin and rated her Physical Impairment as "Class 5 – Severe limitation ... incapable of minimal (sedentary) activity." (Ex. D, 67-68.)

On June 17, 2004, Ms. Garrison informed Aetna that her doctors have advised her that "with the fusion, cadaver bone, and 'tons of hardware' it's normal that it will take longer for recovery from this surgery." She explained that her doctor thought the reason for her continued leg pain is that the nerve on her left leg had to be stretched quite a bit to fit when the surgery was performed – "claimant is now ¾ inch taller than before the surgery." She advised that she takes Neurontin (3 per day), a muscle relaxer and Vicodin, and "has a hard time staying in any one position for very long." (Ex. T, 689, 690, 692.)

Aetna wrote to Ms. Garrison on June 17, 2004, and advised that it was

SHERNOFF BIDART DARRAS
LAWYERS FOR INSURANCE POLICYHOLDERS
600 S INDIAN HILL BLVD CLAREMONT CA 91711 TEL 909 621 4935

PLAINTIFF'S OPENING TRIAL BRIEF

reviewing her claim for LTD benefits. (Ex. G, 83-84.) Aetna, however, misrepresented the terms of the Plan when it incorrectly stated that the Plan defined disability during the first 30 months as the inability to perform "the material duties of your own occupation <u>or other appropriate work Boeing may make available to you</u>." (Ex. G, 83 (emphasis added).) Aetna further misrepresented the terms of the Plan by referencing a definition of "own occupation" that is not contained in the Plan:

> "Own occupation means your occupation as it exists in the general economy and not your specific job at Boeing. In reviewing your eligibility for LTD benefits, the issue upon which we must focus is whether or not you have the ability to perform the material duties of your own occupation with reasonable continuity for any employer in the general economy." (*Id.*)

Less than one month later, Aetna approved LTD benefits. In the meantime, it also determined that Ms. Garrison's occupational physical demands were in the "Light" category: "Claimant's occ ... requires constant sitting, occasional stand, walk and lifting up to 20 lbs occasionally (Light Level)." (Ex. T, 698.) Despite not having any travel listed as an occupational requirement, Aetna still determined that Ms. Garrison's occupation was "Light." In another entry, Aetna again confirmed Ms. Garrison's occupation as "Light": "Occupational PDAW/JD dated 2-13-04 reveals occ in light category (constant sit, occasional walk, stand, stoop, kneel, carry, bend, twist. Occasional lift up to 20 pounds); Claimant advised occ requires lots of travel." (Ex. T, 700.) Despite these entries, Aetna would later contend that her occupation was "sedentary."

On July 10, 2004, Ms. Garrison's claim for LTD benefits was approved."[2] (Ex. H, 76-79.) In the approval letter, Ms. Garrison was notified that the Plan had a change in the definition of disability after 24 months of LTD benefits. As of July 29, 2006, the Plan requires that she meet a more strict "any occupation" definition

SHERNOFF BIDART DARRAS
LAWYERS FOR INSURANCE POLICYHOLDERS
600 S INDIAN HILL BLVD. CLAREMONT CA 91711 TEL 909 621 4935

SHERNOFF BIDART DARRAS
LAWYERS FOR INSURANCE POLICYHOLDERS
600 S INDIAN HILL BLVD CLAREMONT CA 91711 TEL 909 621 4935

1    of disability. Aetna once again misrepresented the terms of the Plan when it

2    incorrectly stated that Ms. Garrison "must provide objective medical evidence" in

3    support of her disability from any occupation. (Ex. H, 76 (emphasis added).)

4         On September 14, 2004, Aetna once again documented that Ms. Garrison's

5    occupational demands were "light," with a subsequent entry that "accommodations

6    are ... available" and "ER very eager to get EE back to work ASAP." (Ex. T, 719-

7    720, 728-729.) While Boeing might have been "eager to get [Ms. Garrison] back

8    to work," that is not the determining factor – it's Ms. Garrison's ability to perform

9    the material duties of her occupation without accommodation. And (as discussed

10    below), when determining exactly what Ms. Garrison's occupation is, Aetna is

11    climbing a very slippery slope with the "accommodation path."

12         On January 31, 2005, Dr. Dennis completed another APS with diagnoses of

13    degenerative disc disease of the lumbar spine and radiculitis with back pain, leg

14    pain and numbness; medication included Celebrex. Dr. Dennis documented that

15    Ms. Garrison has "no ability to work, severe limitation of functional capacity;

16    incapable of minimal activity." He gave restrictions and limitations to include "no

17    lifting, no bending, no stooping" and indicated that objective findings include back

18    and leg pain with inability to sit or stand for prolonged periods. He documented

19    "zero" hours that she is capable of working in a day and "zero" number of days

20    that she is able to work. (Ex. D, 101-102.)

21         On March 3, 2005, Ms. Garrison was examined by David A. Gehret, MD,

22    Diplomate of American Board of Neurology, who noted current complaints of

23    aching pain in hip and thigh, with intermittent numbness in the foot, and occasional

24    tingling in the calf. Dr. Gehret documented that she has also been referred by Dr.

25    Dennis to Dr. Robert Johnson, a psychiatrist who placed her on Trazodone. The

26    patient informed Dr. Gehret that she would like to return to some form of work.

27    _____

28    [2] Aetna also advised that Ms. Garrison was eligible for continuation of her life
      insurance policy due to her disability. (Ex. H, 80-81.)

PLAINTIFF'S OPENING TRIAL BRIEF

1     Dr. Gehret opined that the back pain was not emanating from the lumbar spine

2 since her EMG/NCV studies were normal. He diagnosed her with iliotibial

3 tendonitis/fasciitis and gave her a trial of Naprosyn. He also ordered physical

4 therapy with a diagnosis of left iliotibial band pain and irritation. (Ex. Q, 107-110.)

5     On March 10, 2005, a Lumbar Spine Evaluation was performed by Michael

6 Mandas, PT, who documented that Ms. Garrison has been experiencing pain in her

7 left hip and lateral thigh since undergoing lumbar fusion on January 29, 2004.

8 Examination revealed tenderness and decreased range of motion. His assessments

9 include: 1) status post lumbar fusion; 2) positive ilio-tibial band syndrome: 3)

10 positive hip flexor and tensor fasciae latae. (Ex. Q, 111-112.)

11     On March 31, 2005, Dr. Dennis <u>disagreed</u> with Aetna's proposed Return to

12 Work ("RTW") Plan, stating that Ms. Garrison is "unable to work" despite Aetna's

13 contentions that her occupation is "SEDENTARY" because it involved office

14 work, no travel and accommodations are available. (Ex. E, 115.) Dr. Dennis also

15 disagreed with Aetna's subsequent RTW Plans as noted in his responses dated

16 June 9, 2005 and January 27, 2006. (Ex. E, 125, 196.)

17     Complicating her medical condition, and contributing to the disabling pain

18 that she was already suffering, on April 18, 2005, Ms. Garrison was involved in a

19 significant motor vehicle accident when she was hit from behind at a high rate of

20 speed by a very large SUV. As Dr. Dennis documented during his April 22, 2005

21 examination, she "has had a lot of stiffness and soreness beginning shortly after the

22 accident." Dr. Dennis prescribed physical therapy to the cervical and lumbar areas.

23 (Ex. Q, 117-118.)

24     On June 3, 2005, Michael Mandas, PT, performed a Cervical Spine

25 Evaluation due to neck and right shoulder pain since the April 18th car accident.

26 He documented aggravating factors of "standing, sitting, lifting and head

27 movement," and current medications of Vicodin, Naproxen and Trazadone. His

28 assessments include: 1) Pain in the cervical neck and radiating in to the right

SHERNOFF BIDART DARRAS
LAWYERS FOR INSURANCE POLICYHOLDERS
600 S INDIAN HILL BLVD  CLAREMONT CA 91711  TEL 909 621 4935

PLAINTIFF'S OPENING TRIAL BRIEF

shoulder; 2) Limited range of motion cervical spine with segmental restrictions. (Ex. Q, 120.) Ms. Garrison informed Aetna that she was involved in a car accident on April 18th and was suffering from whiplash. (Ex. T, 771.)

Ms. Garrison continued to treat with Dr. Dennis for low back, leg and neck pain. Dr. Dennis prescribed ongoing physical therapy, and pain and anti-inflammatory medications, including: Valium, Naprosyn and Neurontin. (Ex. Q, 133, 138, 142, 143, 145, 146, 153, 154, 185, 191.)

On October 31, 2005, Ms. Garrison informed Aetna that her daily activities were limited by her ability to push herself and that she needed breaks to complete activities. She continued with physical therapy and her medications included Neurontin, Naprosyn and Valium. According to her attending physician, she will never be able to work 40 hours a week. (Ex. T, 796-798.)

On January 27, 2006, Ms. Garrison was examined by Dr. Dennis who documented that she "continues to have significant mechanical pain in her cervical spine with radiation into the shoulder, particularly on the left side." (Ex. Q, 197.) Dr. Dennis also completed an APS on this date which documented diagnoses of cervical degenerative disc disease and lumbar degenerative disc disease, with objective findings of "neck pain, upper extremity pain, numbness, headaches, [and] low back pain." Treatment included rest, acupuncture and medications – Neurontin, Naprosyn and Valium. He indicated that Ms. Garrison was motivated to work but was unable to do so. (Ex. D, 198-200.)

Ms. Garrison was also evaluated by Lisa Gibilies, M.S., Licensed Acupuncturist, on January 27, 2006, for Cervical Spine Strain/Sprain, Pain, Impaired Mobility and Function. It was documented that Ms. Garrison reported neck and shoulder pain as deep ache, constant at 7 of 10. Examination of the musculoskeletal system revealed slow and guarded range of motion in all ranges. (Ex. Q, 201-202.) On February 13, 2006, an MRI of the Cervical Spine revealed degenerative disk disease at C4-5 and C5-6. (Ex. Q, 244.)

SHERNOFF BIDART DARRAS
LAWYERS FOR INSURANCE POLICYHOLDERS
600 S INDIAN HILL BLVD. CLAREMONT CA 9171. TEL 909 621 4935

PLAINTIFF'S OPENING TRIAL BRIEF

On March 24, 2006, Ms. Garrison provided Aetna with a current list of her medical providers and indicated that she was taking the following medications: Neurontin,[3] 900 mg/day; Naprosyn,[4] 1000 mg/day; Valium,[5] 5 mg/day; Trazodone,[6] 50 mg/day; and Vicodin,[7] 500 mg as required. (Ex. B, 245-247.) Ms. Garrison also completed Authorizations for financial and medical information, along with a Work History and Education Questionnaire, indicating that she is "unable to maintain standing, sitting or walking for extended periods (in excess of 30-60 min). Travel is extremely difficult – unable to lift or transport luggage. Need frequent rest periods during the day." (Ex. B, 248-255.)

On April 7, 2006, Ms. Garrison was examined by Dr. Dennis who documented that she "continues to have mechanical symptoms with radiating thigh pain ... also has issues with her cervical spine ... and still has persistent and ongoing soft tissue symptoms that are not resolved with intermittent radiculitis." He opined that "she will never return to work at her former job with Boeing due to the mandatory number of hours, travel, prolonged sitting for computer work and meetings." (Ex. Q, 256.)

On May 8, 2006, Ms. Garrison informed Aetna that she had an epigastric hernia repair on May 5, 2006 performed by Dr. David Crnic. Ms. Garrison gave Aetna Dr. Crnic's phone number, yet Aetna failed to obtain any medical records.

---

[3] Side effects include: Drowsiness, dizziness, unsteadiness, fatigue, vision changes and constipation.
[4] Side effects include: Ringing in the ears headaches, dizziness, drowsiness, abdominal pain, nausea, diarrhea, constipation, heartburn, fluid retention and shortness of breath.
[5] Side effects include: Drowsiness, fatigue and ataxia (loss of balance).
[6] Side effects include: Nausea, dizziness, insomnia, agitation, tiredness, dry mouth, constipation, lightheadedness, headaches, low blood pressure, blurred vision and confusion.
[7] Side effects include: Nausea, vomiting, constipation, lightheadedness, dizziness, drowsiness, flushing, vision changes and mental/mood changes.

PLAINTIFF'S OPENING TRIAL BRIEF

SHERNOFF BIDART DARRAS
LAWYERS FOR INSURANCE POLICYHOLDERS
600 S INDIAN HILL BLVD CLAREMONT CA 91711 TEL 909 621 4935

1  (Ex. T, 866.)

2        **E.    Aetna's Denial Of Ms. Garrison's Claim**

3        On July 5, 2006, Aetna notified Ms. Garrison that it was terminating her

4  LTD benefits effective June 29, 2006 as she was not "unable to perform [her] own

5  occupation."[8] Aetna relied extensively on a suspect IME Report prepared by Elite

6  Physicians/NMR's Dr. Mitchell Cohen and an incorrect job classification based on

7  an "own occupation" definition not contained in the Plan and improper

8  consideration of work-place accommodations. (Ex. I, 353-356.)

9        **1.    The Suspect IME Report**

10        In May 2006, Aetna arranged an examination of Ms. Garrison through Elite

11  Physicians/NMR[9]. The IME was performed on May 16, 2006 by Dr. Mitchell

12  Cohen (Ex. L, 304-316), who documented in his Report current complaints of

13  "constant aching sensation across her low back [and] constant shooting pain in her

14  left leg ... Her low back pain increases with any prolonged position/movements,

15  such as sitting, walking or standing ... she has numbness and tingling in her left

16  calf and foot." She also has "constant aching pain across her posterior neck

17  radiating into her right shoulder [and] numbness in both hands." Dr. Cohen listed

18  Current Medications: Neurontin, Naprosyn, Valium, Vicodin; and Prior Surgeries:

19  None. (Ex. L, 306-307.) Dr. Cohen diagnosed: 1) Cervical musculoligamentous

20  strain; 2) Status post anterior posterior fusion of the lumbar spine. (Ex. L, 313.)

21  Dr. Cohen concluded:

22        "The patient's examination today is essentially normal ... She has good
23        range of motion of the cervical and lumbar spine ...

24        It is my opinion, the patient should be able to perform a sedentary physical
25        demand level for 8 hours a day and 40 hours a week. I can find no medical
26        reason that would prevent this patient from doing a sedentary type of job.

27  _____
   [8] Aetna also advised that due to the termination of her LTD claim she was no
28  longer eligible for continuation of her group life insurance. (Ex. I, 357-358.)
   [9] Aetna paid Elite Physicians/NMR $1,495.00 for the IME. (Ex. L, 347.)

PLAINTIFF'S OPENING TRIAL BRIEF

SHERNOFF BIDART DARRAS
LAWYERS FOR INSURANCE POLICYHOLDERS
600 S INDIAN HILL BLVD CLAREMONT CA 9711 TEL 909 621 4935

This is a normal activity of daily living, that most likely, she is doing at this time. She should be allowed to change position at will to avoid prolonged sitting or standing to avoid exacerabating her low back symptoms." (Ex. L, 314.)

Dr. Cohen also completed a Capabilities and Limitations Worksheet indicating that Ms. Garrison can perform "occasional" sitting (no more than a total of .5 to 2.5 hours during the day) and can never lift 11-20 lbs (or more). Dr. Cohen certified that these restrictions were "permanent." (Ex. L, 316.)

Dr. Cohen's Report is suspect for several reasons:

- Dr. Cohen stated that he "can find no medical reason that would prevent [Ms. Garrison] from doing a sedentary type of job." Dr. Cohen contradicted himself as he knew that prolonged sitting increases her low back pain and sedentary work is mostly sitting. Clearly Dr. Cohen knows that sitting for prolonged periods is one activity that is not tolerated well by someone with a low back condition and yet he still opined that she could do a sedentary job for 8 hours a day and 40 hours a week.

- Dr. Cohen indicated that Ms. Garrison can perform "occasional" sitting – which by Aetna's own definition means that she can only sit for between .5 and 2.5 hours during the day. However, Dr. Cohen contradicted himself again, indicating she can do sedentary work, which is mostly sitting. No matter how many times Ms. Garrison is allowed to change position, there is simply no way she can perform a sedentary job for 8 hours a day while also limiting her total sitting time to no more than 2.5 hours.

- Dr. Cohen stated that he "can find no medical reason that would prevent [Ms. Garrison] from doing a sedentary type of job." However, Dr. Cohen also documented that Ms. Garrison's current medications included Neurontin, Naprosyn, Valium and Vicodin – all of which have significant side effects not addressed by Dr. Cohen.

- Dr. Cohen stated that a "sedentary type of job" is a "normal activity of daily living, that most likely, [Ms. Garrison] is doing at this time." However, "normal activity of daily living" does not transfer into an

- 12 -

SHERNOFF BIDART DARRAS
LAWYERS FOR INSURANCE POLICYHOLDERS
600 S INDIAN HILL BLVD CLAREMONT CA 91711 TEL 909 621 4935

ability to perform the material duties of an occupation.

- Dr. Cohen stated that the "patient has good range of motion of the cervical and lumbar spine." Dr. Cohen contradicted himself when he answered "Question 2: What are the objective findings on physical examination?" by responding that Ms. Garrison has decreased range of motion of the cervical and lumbar spine. If the range of motion is "decreased," then it cannot be "good."

- Dr. Cohen gave diagnoses of "1. Cervical musculoligamentous strain. 2. Status post anterior and posterior fusion of the lumbar spine." He simply ignored Ms. Garrison's other documented diagnoses of pain, degenerative disc disease, radiculitis, spondylolisthesis, left iliotibial band pain and irritation.

- Dr. Cohen stated that "Ms. Garrison worked as a Director for Boeing for 23 years ... This work involved a lot of travel, but was mostly a sedentary position." But how can an occupation that involves "a lot of travel" only be a "sedentary" occupation.

- Dr. Cohen stated "Prior Surgeries: None." But what abut the 2001 and 2004 back surgeries, and the recent 2006 hernia surgery.

On June 13, 2006, Ms. Garrison asked Aetna to send a copy of Dr. Cohen's Report to Dr. Dennis for review. (Ex. J, 348.) But before Dr. Dennis had a chance to respond, Aetna denied Ms. Garrison's claim based on Dr. Cohen's report and the incorrect assertion that her occupation was "sedentary."

## 2. Aetna Incorrectly Classifies Ms. Garrison's Occupation As Sedentary

On June 13, 2006, Aetna once again documented that Ms. Garrison's occupational demands were "Light": "EE's own occupation is considered light in general economy." (Ex. T, 905.) But quickly began looking for a way to change that classification to "sedentary." On June 23, 2006, Aetna documented "after review of EE's job/occ, it was determined that travel was part of ee's description. As travel would be in the light physical demand category and EE restricted to

SHERNOFF BIDART DARRAS
LAWYERS FOR INSURANCE POLICYHOLDERS
600 S INDIAN HILL BLVD  CLAREMONT CA 91711  TEL (909) 621 4935

sedentary per IME and RMD, would need to add restriction of no travel to EE's capabilities and limitations." (Ex. T, 915.)

Based on representations by Ms. Garrison's employer that prior to her disability, accommodations had been made for no travel, and that her employer was willing to continue to provide such accommodations, Aetna asserted that her occupation was sedentary and decided to terminate her claim. (Ex. T, 930.)

On July 5, 2006, Aetna wrote to Ms. Garrison and advised that her claim was being denied effective June 29, 2006. (Ex. I, 353-356.) Aetna once again misrepresented the terms of the Plan when it incorrectly stated that disability was defined during the first 30 months as the inability to perform "the material duties of your own occupation <u>or other appropriate work regardless of whether that job is currently available.</u>" (Ex. I, 353 (emphasis added).) Aetna further misrepresented the terms of the Plan by looking at Ms. Garrison's "own occupation as it exists in the general economy, not in your specific job." (Ex. I, 354.)

According to the denial letter:

"[W]e determined that your occupation in the general economy would be classified as sedentary work demand. We contacted your employer and it was determined that prior to your leave of absence your own job was being performed in the sedentary work demand. Previously your job demanded that you travel, but your employer had accommodated no traveling and is willing to continue to accommodate the restriction of no traveling. When determining if you continue to meet the definition of disability, we must determine if you are capable of performing your own occupation as it exists in the general economy, not in your specific job ... we have determined that your occupation as Director of Supply Management as performed in the general economy and as can be accommodated at your employer is sedentary. (Ex. I, 354.)

Aetna further explained that based on Dr. Cohen's opinion that Ms. Garrison was able to work in a sedentary level for an 8 hour day, with the ability to change positions at will to avoid prolonged sitting or standing, that she was able to perform her own occupation. (Ex. I, 354-355.)

On July 11, 2006, Ms. Garrison informed Aetna upon discussing the termination of her claim that it is not true that she did not travel prior to going out on claim. (Ex. T, 943.)

### F. Ms. Garrison Submits An Appeal With Extensive Records Supporting Disability

On December 28, 2006, Ms. Garrison submitted an 18-page appeal, explaining that she is disabled due to degenerative disc disease of the lumbar spine and the cervical spine, chronic pain, and the side effects of the medications used to try to control the pain. (Ex. N, 437-454.) In support of her appeal, Ms. Garrison enclosed testimonials, medical records (Ex. Q, 512-540), pharmacy records which evidence Ms. Garrison's extensive use of Neurontin, Naprosyn, Valium and Vicodin (Ex. R, 541-569), medical literature articles relating to ongoing pain in post-operative back surgery patients, and an Employability Analysis completed by Paul Broadus, M.A., a vocational expert, that confirmed Ms. Garrison "is unable to perform the material and substantial duties required by her own occupation as a Director, Supplier Management, either by her own employer, or as performed in the national economy." (Ex. P, 589-594.)

Ms. Garrison also submitted Dr. Dennis' IME Response, in which he explained that Ms. Garrison suffers from chronic lumbar, sciatica and cervical pain caused by degenerative disk disease, with functional limitations due to pain, can not sit, stand or walk for any length of time without changing positions, and is unable to focus for any length of time and, as such she cannot perform in her occupation. Dr. Dennis concluded that "I do not feel Ms. Garrison will ever be able to return to her previous line of work." (Ex. O, 414-415.)

### G. Aetna's Denial Of Ms. Garrison's Appeal

In response to Ms. Garrison's appeal, Aetna requested a medical records

SHERNOFF BIDART DARRAS
LAWYERS FOR INSURANCE POLICYHOLDERS
600 S INDIAN HILL BLVD CLAREMONT CA 91711 TEL 909 621 4935

1   review from MES Solutions.[10] The record review was performed by Dr. David

2   Bauer,[11] who noted that Ms. Garrison had a sedentary job classification and opined

3   that "there are no objective findings on physical examinations by the attending

4   physicians or the FCE examiner, or the surveillance films,[12] or diagnostic testing."

5   (Ex. S, 420-422.) Significantly, as Aetna never specifically asked about subjective

6   findings or subjective complaints in its referral to MES Solutions, the reviewing

7   doctor would not specifically address them. (Ex. U, Bahnam Depo., 29:24-30.)[13]

8       On February 9, 2007, Aetna wrote to Ms. Garrison and upheld the denial of

9   her claim. (Ex. K, 434-436.) For the very first time, however, Aetna actually

10   stated the correct definition of disability during the first 30 months as the inability

11   to perform "the material duties of your own occupation; <u>except that if you start</u>

12   <u>work at a reasonable occupation you will no longer be deemed totally disabled</u>."

13   (Ex. K, 434 (emphasis added).) Relying on Dr. Bauer's opinion, Aetna determined

14   that "there was no evidence of a severe impairment that would restrict Ms.

15   Garrison from performing sedentary activity for an eight hour day." (Ex. K, 436.)

16   **III.    ARGUMENT**

17       **A.    The Court Should Accord Little Deference To Aetna's Claim**

18

19 [10] Plaintiff offers pertinent deposition testimony on the issue of the "nature, extent
20 and effect" of Aetna's structural conflict of interest on the claim decision. *See
Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 970. MES Solutions performs
21 medical reviews for insurance companies, including Aetna, Prudential, MetLife,
22 Cigna and Hartford. (Ex. U, Bahnam Depo., 59:18-60:6.) In 2007, MES Solutions
performed 1,020 medical reviews for Aetna, averaging 85 reviews a month (Ex. U,
23 Bahnam Depo., 58:16-59:6.)
24 [11] Dr. Bauer has performed 1,261 medical reviews for MES Solutions since
January 2005, 30 of which were done for Aetna. (Ex. U, Bahnam Depo., 50:15-
25 51:12, 54:10-20.)
26 [12] Aetna ordered surveillance on Ms. Garrison in May 2006. But after 5 days of
surveillance (45 hours and 48 minutes of surveillance), Aetna only obtained 11
27 minutes and 9 seconds of video. (Ex. M, 317-331.)
28 [13] Aetna paid MES Solutions $866.25 for the record review. (Ex. U, Bahnam
Depo, 30:21-31:1; 31:14-18.)

PLAINTIFF'S OPENING TRIAL BRIEF

SHERNOFF BIDART DARRAS
LAWYERS FOR INSURANCE POLICYHOLDERS
600 S INDIAN HILL BLVD CLAREMONT CA 9711 TEL 909 621 4935

In *Abatie v. Alta Health & Life Ins. Co*, 458 F.3d 95, 965-67 (9th Cir. 2006), the Ninth Circuit instructed that courts temper with "skepticism" their review of discretionary claims decisions made by a fiduciary who also has a conflict of interest. Therefore, where, as here, there is a financial conflict of interest because the administrator both makes the decision and funds the benefits, the conflicted decision-maker will not receive the highly deferential untempered abuse of discretion review that was in place before *Abatie*. *Id.* Rather, the mere fact that Aetna is a conflicted fiduciary must be weighed by the Court, together with any other evidence tending to show the "nature, extent and effect" that Aetna's conflict had on the claim decision. *Id.*at 967-68.

In conducting this inquiry, *Abatie* states that courts may weigh the conflict more heavily if presented with evidence of, *inter alia,* self-dealing, failure to adequately investigate a claim, failure to credit a claimant's reliable evidence, or inconsistent plan interpretations. *Id.* at 968-69. A court may also consider whether the administrator used a "truly independent medical examiner or a neutral, independent review. *Id.* at 969, n. 7. This evidence is not limited to the administrative record. *Id.* at 970.

In this case, Aetna's claim decision should be given little or no deference due to the fact that its investigation and claims decision was tainted by the very same conduct described as "heavy" conflict in *Abatie*. Aetna's "heavy" conflict is demonstrated by the following.

### 1. Aetna Failed To Investigate Ms. Garrison's Reports Of Pain, Fatigue And Side-Effects Of Her Narcotic Pain Medications

Ms. Garrison, along with her medical providers, informed Aetna on numerous occasions that she suffered from chronic pain and fatigue, as well as the side-effects of her numerous pain medications, and that in addition to her physical limitations, she was unable to focus for any length of time. For example, on March

PLAINTIFF'S OPENING TRIAL BRIEF

24, 2006, Ms. Garrison informed Aetna that she "needs frequent rest periods during the day" and was taking the following medications: Neurontin, 900 mg/day; Naprosyn, 1000 mg/day; Valium, 5 mg/day; Trazodone, 50 mg/day; and Vicodin, 500 mg as required. (*See* Ex. B, 245-248.) Dr. Dennis also explained that Ms. Garrison suffered from chronic lumbar, sciatica and cervical pain caused by degenerative disk disease, has functional limitations due to pain, and is unable to focus for any length of time that would allow her to function on a level necessary to perform in her occupation. (*See* Ex. O, 414-415.)

Aetna, however, chose to ignore all of Ms. Garrison's subjective complaints of pain and fatigue, and focus instead on "objective" evidence which was not required by the Plan. Aetna also chose to ignore Ms. Garrison's extensive use of Neurontin, Naprosyn, Valium and Vicocdin as evidenced in the pharmacy records submitted with her appeal. There is absolutely no reference, consideration, or mention by Aetna (or any of the reviewing physicians) as to Ms. Garrison's complaints of pain, fatigue, or side effects of her medications.

In *Archuleta v. Reliance Standard Life Ins. Co.*, 504 F. Supp. 2d 876, 883, 885 (C.D. Cal. 2007), the court found that the insurer's decision "was greatly impacted by its conflict of interest" and reviewed the decision "with elevated scrutiny and skepticism" based in large part on the insurer's failure to investigate the side-effects of plaintiff's narcotic pain medication. As the court explained, "defendant did not investigate the extent of the debilitating side effects of plaintiff's pain medications because it understood the results of such an investigation would not have supported its denial." *Id.* at 884.

Similarly, in *Saffon v. Wells Fargo & Co. Long Term Disability Plan*, --- F.3d---, 2008 WL 80704 (9th Cir. 2008), the Ninth Circuit recently explained with regards to subject complaints of pain, that if the insurer "is turning down [the claimant's] application for benefits based on [her] failure to produce evidence that simply is not available, that too may bear on the degree of deference the district

SHERNOFF BIDART DARRAS
LAWYERS FOR INSURANCE POLICYHOLDERS
600 S INDIAN HILL BLVD CLAREMONT CA 9711 TEL 909 621 4935

1    court shall accord MetLife's decision." *Id.* at 7.

2        2.    **Aetna Misrepresented The Terms Of The Plan And**
3              **Improperly Classified Ms. Garrison's Occupation As**
             **"Sedentary"**
4        The Plan defines total disability during the first 30 months as the inability

5    "to perform the material duties of your own occupation; except that if you start

6    work at a reasonable occupation you will no longer be deemed totally disabled."

7    The Plan does not define own occupation in the general economy. (*See* Ex. A, 26.)

8    Aetna, however, told Ms. Garrison that the Plan defined disability during this

9    period as the inability to perform "the material duties of your own occupation <u>or</u>

10   <u>other appropriate work Boeing may make available to you</u>" and that "Own

11   occupation means your occupation as it exists in the general economy and not your

12   specific job at Boeing." (*See* Ex. G, 83; Ex. I, 353-354.) In addition, Aetna

13   initially classified Ms. Garrison's occupation as "light," but then later contended

14   that her occupation was "sedentary" based on an improper consideration of work-

15   place accommodations. (*See* Ex. T, 698, 700, 905, 915, 930.)

16       This is especially egregious considering Ms. Garrison's claim was denied

17   during the "own occupation" period based on Aetna's determination that she could

18   perform at the "sedentary" level. (*See* Ex. I, 354-355; Ex. K, 436.*)*

19       3.    **Aetna Refused to Credit Ms. Garrison's Reliable Evidence**
20       The medical records clearly document that Ms. Garrison is unable to

21   perform the material duties of her occupation due to degenerative disc disease of

22   the lumbar spine and the cervical spine, chronic pain, fatigue, and the side effects

23   of the medications used to try to control the pain. Dr. Dennis has steadfastly

24   certified Ms. Garrison's disability, documenting her functional limitations from

25   both a physical and cognitive aspect, and opining that "I do not feel Ms. Garrison

26   will ever be able to return to her previous line of work." (*See* Ex. O, 414.) Aetna,

27   however, simply failed to give *any* credit or consideration to this reliable evidence.

28       4.    **Aetna Relied On Suspect Medical Reviews**

SHERNOFF BIDART DARRAS
LAWYERS FOR INSURANCE POLICYHOLDERS
600 S INDIAN HILL BLVD CLAREMONT CA 9171 TEL 909 621 4935

PLAINTIFF'S OPENING TRIAL BRIEF

SHERNOFF BIDART DARRAS
LAWYERS FOR INSURANCE POLICYHOLDERS
600 S INDIAN HILL BLVD CLAREMONT CA 91711 TEL 909 621 4935

1    In determining that Ms. Garrison was no longer disabled from her

2    occupation, Aetna relied on the opinions of physicians retained by Elite

3    Physicians/NMR and MES Solutions. However, as discussed in detail above (*see*

4    Section II. E. 1), Dr. Cohen's opinion that Ms. Garrison can perform a sedentary

5    occupation for eight hours a day is suspect at best. And Dr. Bauer's opinion is

6    equally suspect as he focused solely on "objective" evidence, ignored Ms.

7    Garrison's subjective complaints of pain and fatigue, and failed to take into

8    account the side-effects of Ms. Garrison's narcotic pain medications. (*See* Ex. U,

9    Bahnam Depo., 29:24-30.) Moreover, given the financial incentives of these

10   companies to maintain their lucrative contracts with insurance companies,[14] they

11   cannot be considered to be "truly independent medical examiners" as required by

12   *Abatie.* 458 F.3d at 969 n. 7

13       The above demonstrates that Aetna's claim decision is deserving of little, if

14   any deference under the arbitrary and capricious standard. The Court should

15   review Aetna's claim decision with a high degree of skepticism, commensurate

16   with the biased nature in which Aetna handled this claim.

17       **B.    Aetna's Termination Of Benefits Was Arbitrary And Capricious**

18       The same reasons that warrant this Court to review Aetna's decision with

19   elevated scrutiny and skepticism, also warrant a finding that Aetna abused its

20   discretion when it terminated Ms. Garrison's claim. As the court explained in

21   *Archuleta*, 504 F. Supp. 2d at 885, "the issues already discussed by the Court [in

22   determining the impact of the administrator's conflict of interest] reveal that the

23   administrator abused its discretion in the decision to deny benefits."

24   _____

25   [14] MES Solutions performs medical reviews for insurance companies, including

26   Aetna, Prudential, MetLife, Cigna and Hartford. (Ex. U, Bahnam Depo., 59:18-
     60:6.) In 2007, MES Solutions performed 1,020 medical reviews for Aetna,

27   averaging 85 reviews a month (Ex. U, Bahnam Depo., 58:16-59:6.) Dr. Bauer has

28   performed 1,261 medical reviews for MES Solutions since January 2005, 30 of
     which were done for Aetna. (Ex. U, Bahnam Depo., 50:15-51:12, 54:10-20.)

PLAINTIFF'S OPENING TRIAL BRIEF

SHERNOFF BIDART DARRAS
LAWYERS FOR INSURANCE POLICYHOLDERS
600 S INDIAN HILL BLVD. CLAREMONT CA 91711. TEL 909 621 4935

1. **Aetna's Failure To Investigate Ms. Garrison's Reports Of Pain, Fatigue And Side-Effects Of Her Narcotic Pain Medications Was An Abuse Of Discretion**

As discussed above, Aetna was well aware that Ms. Garrison suffered from chronic pain and fatigue, as well as the side-effects of numerous pain medications. Aetna, however, simply chose to ignore these complaints and focus instead on "objective" evidence, even though the Plan contains no such requirement. The reason Aetna did this is quite clear, "because it understood the results of such an investigation would not have supported its denial." *Archuleta*, 504 F. Supp. 2d at 884. Here, even assuming that Aetna's contention that Ms. Garrison has the ability to perform at a "sedentary" level based on her physical limitations is correct, given her subjective complaints of pain, fatigue and side-effects of her pain medications, Ms. Garrison does not have the cognitive ability to perform her occupation, which requires a great deal of thinking, mental clarity and focus.

Moreover, as the Ninth Circuit recently held in *Saffon*, ---F.3d---, 2008 WL 80704, it is an abuse of discretion for an administrator to require "objective" evidence when such evidence is simply not available. Relying on Social Security disability cases, where "individual reactions to pain are subjective and not easily determined by reference to objective measurements," the court explained that if the insurer "is turning down [the claimant's] application for benefits based on [her] failure to produce evidence that simply is not available, that too may bear ... on its ultimate determination as to whether [the claimant] is disabled." *Id.* at 7. *See also, Prado v. Allied Domecq Sprits and Wine Group Disability Income Policy*, 2008 WL 191985, *9 (N.D. Cal.) ["insurer may not ignore Plaintiff's subjective pain complaints and instead rely solely on objective evidence if evidence of Plaintiff's pain is not available"].

2. **Aetna's Application Of The Own Occupation Definition Of Disability And Classification Of Ms. Garrison's Occupation As "Sedentary" Was An Abuse Of Discretion**

As Aetna correctly stated in its February 9, 2007 appeal denial letter, the

- 21 -

1   Plan defines disability during the first 30 months as the inability to perform "the
2   material duties of your own occupation; <u>except that if you start work at a</u>
3   <u>reasonable occupation you will no longer be deemed totally disabled</u>." (*See* Ex. K,
4   434.)  It is anticipated that Aetna may try to argue that the definition in the SPD
5   controls, such that disability during the first 30 months is the inability to perform
6   "the material duties of your own occupation <u>or other appropriate work Boeing may</u>
7   <u>make available to you</u>" in order to argue that as Boeing said they would
8   accommodate Ms. Garrison, she is not from her own occupation as she is able to
9   perform "other appropriate work" that Boeing made available.  This argument fails
10  for several reasons.
11      First, it is well settled in the Ninth Circuit that when a conflict exists
12  between plan documents, the language most favorable to the employee controls.  It
13  has been noted that "when the plan master document is more favorable to the
14  employee than the SPD ... it controls, despite contrary unambiguous provisions in
15  the SPD." *Bergt v The Retirment Plan for Pilots Employed by Markair, Inc.*, 293
16  F.3d 1139, 1145 (9th Cir. 2002).  In *Bergt*, the court adopted the Fifth Circuit's
17  reasoning that "any burden of uncertainty created by careless or inaccurate drafting
18  of the summary must be placed on those who do the drafting, and who are most
19  able to bear the burden, and not on the individual employee, who is powerless to
20  affect the drafting of the summary or the policy and ill equipped to bear the
21  financial hardship that might result from a misleading or confusing document." *Id.*
22  (citing *Hansen v Continental Ins. Co.*, 940 F.2d 971, 982 (5th Cir. 1991)).
23      The Central District itself, interpreting *Bergt*, has held that whichever
24  document is most favorable to the employee will be binding.  In *Vasquez v Cargill,*
25  *Inc.*, 509 F. Supp. 2d 903, 905 (C.D. Cal. 2007), the court found, "[i]f a conflict
26  arises between an ERISA plan master document and a summary plan description
27  more favorable to an employee, the summary plan description controls."
28  Meanwhile, in *Mitchell v Metropolitan Life Ins. Co.*, 523 F. Supp. 2d 1132, the

SHERNOFF BIDART DARRAS
LAWYERS FOR INSURANCE POLICYHOLDERS
600 S INDIAN HILL BLVD  CLAREMONT CA 91711  TEL 909 621 4935

PLAINTIFF'S OPENING TRIAL BRIEF

1    court used the master plan's definition of disability, noting that the plaintiff

2    "claim[ed] he was disabled under the mater plan definition," *id,* at 1144, and that it

3    was "more favorable to" the plaintiff." *Id.* at 1145. Thus, given that Ms.

4    Garrison's master plan document is more favorable to her, the Court must use its

5    definition of own occupation in determining whether or not she is disabled.

6        <u>Second</u>, it is an abuse of discretion for Aetna to consider "accommodations"

7    when determining Ms. Garrison's occupational duties. In *Saffle v. Sierra Pacific.*

8    *Power Co.*, 85 F.3d 455 (9th Cir. 1996), the court reviewed a benefit denial and

9    concluded that the administrator's construction of the term "regular occupation" to

10   include the fact that plaintiff could work with accommodation was an abuse of

11   discretion as it was inconsistent with the plain language of the plan and collapsed

12   the threshold for regular occupation to the standard for any occupation. *Id.* at 459.

13   Moreover, courts have held that work performed *after the onset of disability*, does

14   not constitute an insured's regular occupation. In *Peterson v. Continental Casualty*

15   *Co.*, 77 F. Supp. 2d 240 (S.D.N.Y. 1999), the court held that work performed after

16   the onset of disability is not the proper measure of a claimant's regular occupation.

17   In *Peterson*, the Associate Director of News Operations for CBS suffered acute

18   pain, was diagnosed with back problems, and was unable to travel and lift anything

19   over fifteen pounds. Peterson was assigned to a desk job and, after about seven

20   months, he applied for disability benefits. *Id.* at 423. In determining whether

21   Peterson was disabled from his own occupation, the Claims Administrator applied

22   the description of what Peterson did in the modified job that required little or no

23   physical activity. *Id.* at 426. Applying an abuse of discretion standard of review,

24   the court held that it was a "foregone conclusion" that "the Administrator's

25   decision was arbitrary and capricious." *Id.* at 247. The *Peterson* court stated that

26   the job Peterson performed immediately prior to his date of disability was an

27   accommodation to his physical limitations, and the duties were not comparable to

28   the duties of his regular occupation. *Id.* at 428. The court reasoned that "[w]hether

SHERNOFF BIDART DARRAS
LAWYERS FOR INSURANCE POLICYHOLDERS
600 S INDIAN HILL BLVD. CLAREMONT CA 91711 TEL 909 621 4935

PLAINTIFF'S OPENING TRIAL BRIEF

1  or not he could do that job was and is irrelevant under the terms of the plan." *Id.*

2  Accordingly, as Aetna initially determined, Ms. Garrison's occupation is
3  classified as "light."

4  Third, it is an abuse of discretion for Aetna to deny Ms. Garrison's benefits
5  based on its contention that she could perform "sedentary" work rather than her
6  actual occupation. The Plan's test for disability is the inability to perform one's
7  occupation, not the inability to perform a "sedentary" occupation – which is
8  exactly what Aetna's reviewing doctors opined. Moreover, Aetna never took into
9  account that Ms. Garrison's occupation required a great deal of thinking, mental
10  clarity and focus. However, even assuming that Ms. Garrison could perform
11  "sedentary" work such a finding is not equivalent to a finding that she could
12  perform her own occupation and earn more than 80% of her predisability earnings.
13  *See Sabatino v. Liberty Life Assurance Co.*, 286 F. Supp. 2d 1221, 1231 (N.D. Cal.
14  2003) ["Plaintiff was employed as an engineer, which may be a sedentary
15  occupation, but one that requires careful thought and concentration. Simply being
16  able to perform sedentary work does not necessarily enable one to work as an
17  engineer."]

18      4.  **Aetna's Reliance On suspect Medical Review Was An
            Abuse of Discretion**
19
        As discussed in detail above, it is an abuse of discretion for Aetna to rely on
20
    the opinions of Dr. Cohen and Dr. Bauer in determining that Ms. Garrison was no
21
    longer disabled from her own occupation. Neither Dr. Cohen or Dr. Bauer
22
    considered Ms. Garrison's subjective complaints of pain or fatigue; nor did they
23
    consider the side-effects of her pain medications. Yet, both simply opined that Ms.
24
    Garrison was able to perform "sedentary" work with the noted restrictions related
25
    to her low back condition.
26
        However, even assuming that it is reasonable for Aetna to rely on the IME
27
    report that Ms. Garrison can perform sedentary work, based on Dr. Cohen's
28
    findings, Ms. Garrison is still disabled from performing the material duties of her

SHERNOFF BIDART DARRAS
LAWYERS FOR INSURANCE POLICYHOLDERS
600 S INDIAN HILL BLVD CLAREMONT CA 91711 TEL 909 621 4935

occupation:

- According to Dr. Cohen, Ms. Garrison can "never" lift more than 11-20 pounds. Yet, according to her employer, Ms. Garrison's occupation required lifting 11-20 pounds "occasionally." (58 – ER Job Descrip, 316 – Dr. Cohen Cap Form). If she is required to lift 11-20 pounds occasionally and Aetna's doctor has limited her to <u>never</u> lifting that amount – she is disabled.

- According to Dr. Cohen, Ms. Garrison can only sit "occasionally" (.5 to 2.5 hours). Yet, according to her employer, Ms. Garrison's occupation required sitting "continuously" (5.1 to 8 hours). (58 – ER Job Descrip, 316 – Dr. Cohen Cap Form). If she is required to sit for the majority of the day and Aetna's doctor has limited her to <u>occasional</u> sitting – she is disabled.

- According to Dr. Cohen, Ms. Garrison can only work a total of 8 hours a day. Yet, according to her employer, Ms. Garrison's occupation required a work shift of 12 hours with overtime. (58 – ER Job Descrip, 316 – Dr. Cohen Cap Form). If she is required to work a 12 hour shift and Aetna's doctor has only certified that she can work an 8 hour shift – she is disabled.

## IV.    CONCLUSION

For the foregoing reasons, Ms. Garrison requests that the Court enter judgment in her favor, reinstating her to the Plan, with payment of back benefits. Plaintiff also requests that the Court enter an Order, finding her to be entitled to an award of attorneys' fees and costs, to be determined by Local Rule 54-12.

DATED:  February 12, 2008            Respectfully submitted,

SHERNOFF BIDART & DARRAS, LLP

FRANK N. DARRAS
LISSA A. MARTINEZ
Attorneys for Plaintiff CARI GARRISON

SHERNOFF BIDART DARRAS
LAWYERS FOR INSURANCE POLICYHOLDERS
600 S INDIAN HILL BLVD CLAREMONT CA 91711 TEL 909 621 4935

PLAINTIFF'S OPENING TRIAL BRIEF

## PROOF OF SERVICE

**STATE OF CALIFORNIA, COUNTY OF SAN BERNARDINO**

I am employed in the county of San Bernardino, State of California. I am over the age of 18 and not a party to the within action; my business address is: 3257 East Guasti Road, Suite 300, Ontario, California 91761.

On **February 12, 2008**, I served the foregoing document described as:

### PLAINTIFF'S OPENING TRIAL BRIEF

on all interested parties in this action by placing [ ] the original [ x ]a true copy thereof enclosed in sealed envelopes addressed as follows:

Ronald K. Alberts, Esq.
Shannon L. Victor, Esq.
GORDON & REES
633 W. 5th Street, Ste. 4900
Los Angeles, CA 90071
Phone: (213) 576-5000
Fax: (213) 680-4470

Attorneys for Defendants: AETNA LIFE INSURANCE COMPANY and THE BOEING COMPANY EMPLOYEE HEALTH AND WELFARE BENEFIT PLAN

[ x ]BY MAIL
I caused such envelope to be deposited in the mail at Ontario, California. The envelope was mailed with postage thereon fully prepaid. I am "readily familiar" with this firm's practice of collection and processing correspondence for mailing. It is deposited with U.S. postal service on that same day in the ordinary course of business. I am aware that on motion of party served, service is presumed invalid if postal cancellation date or postage meter date is more than 1 day after date deposit for mailing in affidavit.

[ ]BY PERSONAL SERVICE
I caused to be delivered by hand to the above-listed addressees or to the addressees on the list attached hereto. A proof of service executed by the delivery person will be mailed under separate cover.

[ ]BY OVERNIGHT MAIL/COURIER
To expedite the delivery of the above-named document, said document was sent via overnight courier for next day delivery to the above-listed party.

[ ]BY FACSIMILE ("FAX")
In addition to the manner of proof of service indicated above, a copy was sent by FAX to the above-listed party.

I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made. I declare under penalty of perjury under the laws of California that the above is true and correct.

Executed on **February 12, 2008**, at Ontario, California.

Catherine Carvalho