RONALD K. ALBERTS (SBN: 100017)
SHANNON L. VICTOR (SBN: 221889)
GORDON & REES LLP
633 West Fifth Street
Suite 4900
Los Angeles, CA 90071
Telephone: (213) 576-5000
Facsimile: (213) 680-4470
ralberts@gordonrees.com
svictor@gordonrees.com

Attorneys for Defendants
AETNA LIFE INSURANCE COMPANY;
THE BOEING COMPANY EMPLOYEE
HEALTH AND WELFARE BENEFIT PLAN

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CARI GARRISON,<br><br>                    Plaintiff,<br><br>    vs.<br><br>AETNA LIFE INSURANCE COMPANY;<br>THE BOEING COMPANY EMPLOYEE<br>HEALTH AND WELFARE BENEFIT<br>PLAN<br><br>                  Defendants. | CASE NO. CV 07-03094 JFW (Ex)<br><br>DEFENDANTS, AETNA LIFE INSURANCE COMPANY AND THE BOEING COMPANY EMPLOYEE HEALTH AND WELFARE BENEFIT PLAN'S [PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW |

Defendants, Aetna Life Insurance Company ("Aetna") and The Boeing Company Employee Health And Welfare Benefit Plan hereby submit their proposed Findings of Fact and Conclusions of Law, pursuant to the Court's Order dated August 29, 2007.

## A. FINDINGS OF FACT

1.    Plaintiff was employed by Boeing (0082-0073) as a Director of Subcontractor Management, Future Combat Systems ("FCS") at the time her disability claim was incurred on January 29, 2004, when she underwent a lumbar

fusion to her spine, performed by Steven C. Dennis, M.D. ("Dr. Dennis") (0050-0051). She last worked on January 28 2004 (0048).

Plaintiff's application for short-term disability ("STD") benefits was approved effective February 5, 2004 (0052-0054). Aetna advised Plaintiff she may be entitled to continue STD benefits "for as long as you remain disabled to a maximum of 25 weeks, which would be through July 28, 2004." (0052)

Dr. Dennis periodically filled out Attending Physician's Statements ("APSs") for Plaintiff from 2004 until 2007. He continuously characterized her as temporarily totally disabled, incapable of minimal sedentary activity. Yet his later APS reports indicated there was no medical contraindication for Plaintiff to participate in a vocational rehabilitation program. (0046-0047, 0062-0063, 0067-0068, 0101-0103, 0198-0200, 0414-0540)

2.      On February 13, 2004, Plaintiff's former supervisor filled out a Physical Demand Analysis indicating Plaintiff spent 80% of her day on the phone and/or computer. She was continuously sitting, and frequently performed "fine manipulation." She "occasionally" performed the other activities listed such as standing and walking. She spent 100% of her day indoors, working around others. She occasionally lifted anywhere from 1 to 20 pounds, but never lifted more than 20 pounds. Her usual work shift was 12 hours without rotation. Overtime was required. The range of accommodation hours available was 4 to 6. (0056)

3.      Records indicate a Capabilities and Limitations form was sent to Dr. Dennis on June 15, 2004. (0083)

4.      In a letter dated June 17, 2004, Aetna advised that in order to receive LTD benefits, Plaintiff must complete a 26 week wait period, after which Aetna would decide if she met her plan's "definition of disability" for LTD benefits. (0083-0084) Aetna set forth the definition of totally disabled:

Totally disabled means all of the following conditions apply to you:

You are disabled as a result of an accidental injury or illness (including a pregnancy-related condition).

As a result, you are earning 80 percent or less of indexed pre-disability earnings.

During the first 30 months of disability, your accidental injury or illness prevents you from performing the material duties of your own occupation or other appropriate work Boeing makes available to you.

After the initial 30 months of disability, your accidental injury or illness prevents you from performing the material duties of any reasonable occupation for which you may be suited by training, education and/or experience.

Aetna advised, the 30 months of disability noted above included the 26 week benefit waiting period and the first 24 months of LTD benefits payments. Aetna stated "own occupation means your occupation as it exists in the general economy and not your specific job at Boeing. In reviewing your eligibility for LTD benefits, the issue upon which we must focus is whether or not you have the ability to perform the material duties of your own occupation with reasonable continuity for any employer in the general economy." (0083-0084)

5.     On June 28, 2004, Plaintiff filled out a Work History and Education Questionnaire. She described her duties as "Management of all FCS Supplier MGMT activities contained in numerous locations through the U.S…Position requires long hours, significant travel in an extremely high stress environment." She indicated she was "Unable to travel or work extensive hours. Still experiencing significant pain in lower back and left leg. Daily fatigue & pain would prevent even an 8 hour day. Currently unable to remain in one position for more than 30 minutes. Frequently need to lay down." (0072-0073)

6.     In a letter dated July 10, 2004, Aetna informed Plaintiff her LTD claim had been approved effective July 29, 2004. (0076-0079) She could receive benefits for "up to 24 months" as long as she remained disabled from her "own occupation." Her plan required periodic re-evaluation of her eligibility via medical information from her physician or an independent physician of Aetna's choice. If

Aetna found Plaintiff capable of performing "the material duties" of her "own occupation" her monthly benefits would terminate. If she remained disabled from her own occupation as of July 29, 2004, her LTD Plan required that she meet a stricter, "any occupation" definition of disability. (0076-0079)

7. Screen prints dated September 14, 2004 indicate Plaintiff's employer advised that she "was functioning in a sedentary capacity prior to LOA [leave of absence]." Boeing's Superintendent, stated, "…accommodations are certainly available in any capacity as [she] is a department director. She was not doing any traveling prior to LOA, and would continue with no travel, no lifting, or any activity that would aggravate her condition…job tasks are her own office onsite with office support." (0727-0728)

8. Dr. Dennis referred Plaintiff to David A. Gehret, M.D., Diplomate of the American Board of Neurology, ("Dr. Gehret"), who performed a neurological examination of Plaintiff and reported his findings on March 3, 2005. (0107-0109) With respect to his examination of Plaintiff's "Back," Dr. Gehret wrote, "straight-leg-raising test does not produce pain or paresthesias down either lower extremity." Under "Lower Extremity Exam" he reported "no significant edema of the lower extremities." He noted "tenderness to palpation over the left iliotibial band." Under "Procedures" he listed, "EMG/NCV of the lower extremities." He indicated Plaintiff's prior left L5 radiculopathy had "improved from surgery." Dr. Gehret concluded, Plaintiff "currently has pain, mostly in the left lateral thigh area, and I really think this is not emanating from the lumbar spine, since her EMG/NCV studies looks like she has made excellent recovery and is normal at this time. She also has local tenderness along the iliotibial band and I think that she had some iliotibial tendonitis/fasciitis at this time." (0107-0109)

9. Dr. Dennis also referred Plaintiff to Michael Mandas, P.T., of Los Alamitos Orthopaedic and Sports Physical Therapy for treatment of an 'IT band syndrome on the left.' (0111) Mr. Mandas issued a "Lumbar Spine Evaluation" of

Plaintiff dated March 10, 2005. Plaintiff reportedly experienced pain in her left hip and lateral thigh since her fusion on January 29, 2004, which she claimed had gradually worsened and interfered "with function and with work." She exercised but her pain had not improved. Mr. Mandas stated, "Lumbar x-rays were very good on her last visit to the surgeon." Under objective findings it states, "spinal curves are close to normal limits with flattened lumbar lordosis...moderate tenderness to the distal 1/3 of the left IT band; moderate myofascial tightness in the left TFL and Glut Medius and Maximus." Muscle strength was rated a 4/5 for both her lower extremities and her trunk strength. Her lumbar stabilization skills were "good." Under "Assessment" it states: 1) S/P Lumbar Fusion, 2) IT Band Syndrome Left, 3) Hip Flexor and TFL Tightness, 4) Moderate pain with ADLs, and 5) Pain with home exercise program. (0111)

10. On April 22, 2005, Dr. Dennis reported Plaintiff had been rear-ended by a "large SUV." He stated Plaintiff, "had a lot of stiffness and soreness beginning shortly after the accident, although she is feeling better today than she was yesterday and the day prior to that." A physical exam showed she was neurologically intact and a radiographic exam showed "no change from the films taken in February." He was "a little concerned in regard to the impact" but did not think it would be "an issue." He stated, "I think she is going to do fine." (0117)

11. On March 31, 2005, Aetna sent Dr. Dennis a return to work ("RTW") Plan, advising that, "any accommodation or modified work schedule necessary to assist your patient ['s] successful return to work effort is available." (0113)

12. On June 30, 2005, Aetna sent Plaintiff a letter notifying her of an upcoming change in her LTD Plan's definition of disability. Aetna reiterated the Plan's definition of disability. Since Plaintiff's disability was incurred on January 29, 2004, the first 30 months of disability ends on July 28, 2006. To be eligible for LTD benefits on July 29, 2006 Plaintiff must be disabled "from performing any gainful employment for which she may be suited by education, training or

experiences within a reasonable wage." (0129-0130)

13. A progress report by acupuncturist, Lisa Angela Gibille, M.S., L.Ac, DIpl.AC. ("Ms. Gibille") dated January 27, 2006, indicates Plaintiff was "active around her home and with daily chores and errands." (0201-0202)

14. In Dr. Dennis' report dated March 10, 2006, he states Plaintiff's MRI of February 13, 2006 showed "degenerative disk disease at C4-5 and C5-6, nothing of major consequence." (0244)

15. Screen prints dated March 21, 2006 indicate Aetna conducted a triage (three-party) review of Plaintiff's file and found her medical records did not support a finding that she "would not be capable of performing her own occupation." (0843-0844) A screen print dated March 22, 2006 indicates an Aetna reviewing physician found Plaintiff's record "did not support impairment in functionality" and recommended an orthopedic IME. (0850)

16. In a report by acupuncturist, Ms. Gibille, dated April 3, 2006, she states Plaintiff "has resumed much of her normal routine, along with exercising as she had in the past." (0537-0538)

17. A Background Report from First Advantage Investigative Services ("First Advantage"), dated April 27, 2006, shows Plaintiff was the owner and president of an active corporation, Genevis, Inc., incorporated on April 5, 2004. (0271-0285)

18. On April 12, 2006, Elite Physicians Ltd. (NMR) ("Elite") sent Plaintiff a letter advising that an IME had been scheduled with an orthopedic specialist, Mitchell Cohen, MD ("Dr. Cohen") for May 3, 2006. Elite advised Plaintiff to bring "all films" with her to the appointment. (0257)

19. In a letter dated April 17, 2006, Aetna advised Plaintiff it needed current exam findings for her diagnosis of major depressive disorder ("MDD"). (0259- 0260) Aetna confirmed Plaintiff's IME was rescheduled for May 2, 2006 at 9:30 am. Aetna reiterated the Plan's definition of "totally disabled."

-6-

Gordon & Rees LLP
633 West Fifth Street
Suite 4900
Los Angeles, CA 90071

Gordon & Rees LLP
633 West Fifth Street
Suite 4900
Los Angeles, CA 90071

1    20.    On May 5, 2006, Aetna advised Plaintiff it was notified by Elite that

2    she had rescheduled her IME to May 16, 2006.  Aetna repeated its need for exam

3    findings for Plaintiff's diagnosis of MDD.  (0302-0303)

4    21.    Dr. Cohen issued his IME report on May 16, 2006, based upon his

5    examination of Plaintiff and the medical records provided to him (which excluded

6    any "films").  (0304-0315)  He stated, "The patient's examination today is

7    essentially normal.  She has some mild muscle spasm of the cervical spine and

8    lumbar spine, but her upper and lower extremities are neurovascularly intact.  She

9    has good range of motion of the cervical and lumbar spine and there is no evidence

10   of any neurologic compression."  He recommended permanent work restrictions of

11   "no heavy lifting and no repetitive bending or stooping of the lumbar spine."

12   Plaintiff reported the following "current stated daily activities":

13

14   > The patient states she rides recumbent bike about 30 minutes a day and does
     > stretching and strengthening for her neck and back.  This takes about an

15   > hour.  She states the rest of the day she is doing household work
     > including laundry.  She does no vacuuming, no washing of the floors   and

16   > no cleaning the bathrooms.  She states she has a cleaning service that does
     > these activities.  She states she grocery shops and gives piano [lessons] a

17   > few times a week.

18

19   Dr. Cohen concluded, "…the patient should be able to perform a sedentary

20   physical demand level for 8 hours a day and 40 hours a week.  I can find no

21   medical reason that would prevent this patient from doing a sedentary type of

22   job…She should be allowed to change position[s] at will to avoid prolonged sitting

23   or standing to avoid exacerbating her low back symptoms."  (0304-0315)

24   22.    On May 18, 2006, Aetna received a report from First Advantage

25   Investigative Services ("First Advantage") which indicated Plaintiff had been

26   observed under surveillance on May 9, 2006, performing the following activities:

27

28   …bending fully at the waist while doing unknown tasks to various

-7-

Gordon & Rees LLP
633 West Fifth Street
Suite 4900
Los Angeles, CA 90071

plants, twisting her neck while looking around, and talking to a cat. The claimant's movements were consistent throughout the surveillance period and could best be described as smooth and fluid. No braces, supports, orthopedic devices were observed. (0317-0325)

23.     A First Advantage report dated May 22, 2006 indicates Plaintiff performed similar activities while under surveillance on May 15, 2006. On May 16, 2006, she was observed carrying objects, "bending fully at the waist while leaning into the vehicle, driving, and walking." (0326-0331)

24.     A screen print dated June 23, 2006 indicates "travel" was determined to be part of Plaintiff's job description. (0915) Since travel "would be in the light physical demand category" and Plaintiff [was] "restricted to sedentary" work, a restriction of "no travel" would need to be added to her work restrictions.

25.     Screen print dated June 28 and 29, 2006, contain an occupational analysis. (0928-0929, 1293-1294) It indicates Plaintiff's occupation corresponds to the US Department of Labor's job title of "Manufacturing Engineer, Chief/Direct[or], Research and Development," which is classified as "sedentary" work "in the general economy." It states:

> Claimant's job has required in the past to travel occasionally according to the EE. However, the ER Supervisor has confirmed today that Claimant's job was performed as sedentary work activity prior to medical LOA and ER continues with willingness to provide any accommodations needed to allow successful RTW effort, which includes not travel requirement. From the information available to date, Claimant has skills and abilities to function in sedentary work activity with L&R's as stated above in own OCC as it exists in the general economy. Claimant's ER is willing to provide any accommodation needed to RTW and further, Claimant's current L&Rs are within the job demands of own job and is welcomed back to work with this employer.

26.     A screen print dated June 28, 2006 documents a call from Plaintiff's Supervisor at Boeing. (0129) He confirmed, "any and all accommodations are available to allow [Plaintiff] to successfully RTW…ER would welcome [Plaintiff]

back to work in any capacity." (1291)

27.   A screen print dated June 29, 2006 states in part (0929-0930):

"The EE's own OCC was evaluated by VRC [vocational rehabilitation counseler]. EE has reported that her own occupation required traveling which would have made her job fall into the light category. Upon VRC review, it was determined that EE's own OCC as it exists in the general economy is performed as a sedentary occupation w/o the essential function of traveling. The VRC contacted EE's supervisor to determine if EE's job could be accommodated and be performed with no traveling. EE's supervisor has reported that prior to EE's disability claim, EE was performing own job in the sedentary capacity and had not been traveling. Supervisor reported that ER is willing to continue to provide accommodations to sedentary activity including no traveling. As VRC as reported that EE's own OCC in general economy is sedentary and ER is willing to accommodate EE's job to sedentary capacity, and EE has medically been found to be capable of performing sedentary work, I recommend termination of claim effective 06/29/06 based on EE not meeting definition of disability from performing own OCC and own job. (0929-0930)

28.   A screen print dated June 29, 2006 (0931-0932), states:

"Concur with claim termination. Claimant's own job at Boeing was light level due to the Claimant's requirement to travel. Upon review for any OCC it was assessed that the general economy OCC classification for the nearest job match revealed OCC as sedentary. However, DA felt that due to high level OCC that travel (as required by own job) would seem a likely duty for other employers and if so, that would elevate OCC classification from sedentary to light. Medical review and IME have concluded full time sedentary capacity so it was important to clarify true OCC demand. This STS agreed w/DA's concern in this regard and it was decided to conduct a LMS outreach to alternate ER's to establish if travel is required or not for general economy OCC to ensure DOT class was accurate. While LMS was in process, further review of claim file revealed several contacts w/ER in the past who was willing to provide any accommodation to EE that would facilitate her RTW…as these accommodations were noted in the past, a current outreach was requested to determine if ER would still accommodate and specifically for no travel. If so, claimant's job duties would be sedentary (which corresponds with general economy classification in the DOT). ER confirmed with COV on 6-28-06 that yes, they would accommodate all L&Rs noted in medical review/IME L&Rs, and medical supports full time sedentary capacity, claim termination at this time is supported." (0931-0932)

29.   In a letter dated July 5, 2006, Aetna terminated Plaintiff's LTD benefits. (0353-0356) Aetna reiterated the LTD Plan's definition of "totally disabled." Plaintiff's current diagnosis was reported as cervical DDD and Lumbar

Gordon & Rees LLP
633 West Fifth Street
Suite 4900
Los Angeles, CA 90071

DDD.  A Vocational and Rehabilitation Counselor determined Plaintiff's "occupation in the general economy would be classified as sedentary work demand."  Aetna stated:

> We contacted your employer and it was determined that prior to your leave of absence your own job was being performed in a sedentary work demand. Previously your job demanded that you travel, but your employer had accommodated no traveling and is willing to continue to accommodate the restriction of no traveling.  When determining if you continue to meet the definition of disability, we must determine if you are capable of performing your own occupation as it exists in the general economy, not in your specific job.

Aetna further advised:

> In order to assess your functionality, we obtained your medical records from Dr. Dennis and Los Alamitos Orthopaedic Physical Therapy which included office notes, physical therapy notes, and an MRI from February 5, 2006.  The MRI results were typical degenerative protrusions of CR-C5, C5-6 discs, with mild canal stenosis, mild encroachment on the right neural foramen due to associated bony remodeling.

Aetna further advised an IME was performed by Dr. Cohen on May 16, 2006, to clarify Plaintiff's "functionality."  He concluded Plaintiff was "able to work in a sedentary physical demand level for an 8 hour day" with the restrictions and limitations to avoid exacerbating her symptoms.  Based upon Plaintiff's medical records and the IME, Aetna concluded she was "capable of returning to work in a full time sedentary position with the above restrictions and limitations." Aetna advised, "The information submitted fails to support the conclusion that you have limitations and restrictions related to your diagnosis of Cervical DDD and/or Lumbar DDD that would preclude you from returning to your own occupation." Aetna stated, "While we do not deny that you may have medication, the medical information does not support that your conditions prevented you from performing your own occupation.  The presence of a diagnosis or condition alone is not sufficient to qualify for disability benefits." Aetna listed examples of additional

Gordon & Rees LLP
633 West Fifth Street
Suite 4900
Los Angeles, CA 90071

Gordon & Rees LLP
633 West Fifth Street
Suite 4900
Los Angeles, CA 90071

1    information Plaintiff could submit on appeal. (0353-0356)

2        30.    In a letter dated July 24, 2006, Aetna provided Plaintiff with

3    "pertinent documents upon which the decision to terminate your claim was based

4    and a copy of the written policy and procedures which are relevant to the handling

5    of your claim." (0364-0365) This specifically included a copy of the policy and

6    procedures relevant to Plaintiff's claim handling, Dr. Dennis's medical records,

7    Los Alamitos' physical therapy records, Dr. Cohen's report dated May 16, 2006, a

8    medical director note dated June 13, 2006, a vocation rehabilitation counselor's

9    "own occupation" analysis dated June 28, 2006, and documentation of a vocation

10    rehabilitation counselor's telephone call "from supervisor" dated June 28, 2006.

11    (0364-0365)

12        31.    On November 8, 2006, Plaintiff's counsel sent Aetna a letter

13    requesting that copies of certain documents be provided within 15 days. (0371-

14    0372) On November 20, 2006, Aetna sent a letter to Plaintiff's counsel enclosing a

15    copy of Plaintiff's disability claim, the documents requested, and additional

16    information. (0375-0376, 0380)

17        32.    In a letter dated December 11, 2006, Plaintiff's counsel requested

18    copies of all Aetna Special Investigation Unit claim file documents. (0379) On

19    December 13, 2006, Aetna sent Plaintiff's counsel a copy of Plaintiff's

20    surveillance referral form, surveillance report, and 2 DVDs.

21        33.    On December 28, 2006, Plaintiff appealed and asserted Aetna's denial

22    of her claim was "arbitrary and capricious." (0396-0412) She alleged that as a

23    result of her "unremitting pain, disabling side effects of her numerous medications

24    and her depression secondary to her physical conditions, she [was] no longer able

25    to perform these material and substantial duties of her occupation or any

26    occupation [for] which she is reasonably fitted by training, education, or

27    experience." Plaintiff asserted the administrative record showed "claim

28    deficiencies" including a "biased and flawed vocational analysis" and reliance

-11-

upon a biased "independent" medical examination. (0396-0412)

34.    Plaintiff submitted a short "autobiography" as an exhibit to her appeal, wherein she stated she was dealing with "chronic pain as the result of disk degeneration" which had "reached a plateau." (0455-0460)  In 2003 she was directing the FSC program which "required working 7 days a week for months, generally 12-16 hour days, with frequent travel."  She stated, "My managers on the project knew I was in a great deal of pain and would be as accommodating as possible.  This meant having meetings in my office whenever possible, allowing me to change positions frequently, wearing an icepack or heating pad, and traveling for me whenever possible."  Plaintiff's "bulk project" was coming to a close at the end of 2003.  In 2004, while out on disability, she "created a Mentoring Program for a women's shelter" and could work in spurts when her pain level allowed.  She stated there was "no permanent damage" to her "lumbar area" after her car accident in April of 2005.  Her epigastric hernia surgery in May of 2005 had healed and was no longer a source of pain.  Plaintiff describes herself as a "functioning invalid."  She stated, "For now my days consist of stretching every morning, engaging in some form of exercise to strengthen my back, leg, neck, and shoulder, performing some light chores, resting and reading." (0455-0460)

35.    Plaintiff attached an Employability Analysis by Paul Broadus, MA, dated December 28, 2006, as an exhibit to her appeal.  Mr. Broadus asserted Plaintiff's job should be classified as "Light" rather than "Sedentary" work.  He claimed Plaintiff was, "unable to perform each of the material duties of her own occupation" or "any gainful occupation for which she is reasonably fitted by education, training, or experience." (0381-0386)

36.    Aetna sent Plaintiff's counsel a letter dated January 3, 2007, acknowledging receipt of her request for an appeal. (0413)  Aetna provided further examples of documentation that could be submitted in support of Plaintiff's claim, such as, "...a detailed narrative report, outlining in objective terms the specific

Gordon & Rees LLP
633 West Fifth Street
Suite 4900
Los Angeles, CA 90071

Gordon & Rees LLP
633 West Fifth Street
Suite 4900
Los Angeles, CA 90071

physical and/or mental limitations and restrictions inherent to her condition, which [Plaintiff's] doctor has placed on her as far as gainful activity is concerned; her physician's prognosis including current course of treatment, frequency of visits and specific medication prescribed," plus medical records for the period in which she claims total disability, such as test results, x-rays, lab data, and clinical findings. All information should be received by January 23, 2007." (0413)

37.     In a report dated January 3, 2007, Dr. Dennis stated that as of his last evaluation of Plaintiff, "she had presented and had for a long period of time had a solidly healed fusion at L3-4 and L4-5," but still had ongoing pain. (0414-0415) He did not think she would "ever be able to return to her previous line of work at that both physically and mental stress level that are required for her to function in a competitive business environment." (0414-0415)

38.     A letter from Plaintiff's counsel, dated January 22, 2007, advised that Plaintiff moved to Washington and had an appointment with Dr. Ted Wagner on February 9, 2007. (0416-0417)

39.     A "Peer Review Report" was issued by outside reviewing physician, R. David Bauer, M.D, on January 26, 2007. (0420-0422) Dr. Bauer reviewed Plaintiff's entire file on appeal. His report was based on his review of Plaintiff's medical records including 2 CDs, an IME, and MRI reports. Dr. Bauer commented, "Surveillance indicate[s] that the claimant was observed bending fully at the waist and carrying objects. No pain behaviors were noted. She was able to bend forward and lean to a level below her waist to enter a Mercedes. She ambulates normally without pain behaviors. Her stride length is normal and her gait is normal. She is able to enter her car without any difficulty or halting motions." The MRI from February 15, 2006, shows "typical degenerative protrusions of C4-5, C5-6 with mild canal stenosis, mild encroachment on the right neural foramen due to associated bony remodeling." Plaintiff's physical therapy notes indicated cervical pain without lumbar complaints while others indicated

-13-

lumbar complaints without cervical complaints. Dr. Bauer stated:

> "The attending physician does not provide any objective findings consistent with the claimant's self-reported complaints. The examination performed as a portion of the IME was within normal limits. The surveillance films do not indicate an individual with significant pain behaviors, nor do they indicate anyone with significant limitations of range of motion. The particular car that the individual drives is very low to the ground involving significant flexion of the spine to enter it and to sit in it. She does so without any pain behaviors. This is difficult for anyone with a symptomatic lumbar spine.". (0420-0422)

40.   Aetna denied Plaintiff's appeal for LTD benefits in a letter dated February 9, 2007. (0434-0436) Plaintiff's benefits were certified through June 29, 2006 and terminated based on "medical evidence which showed that she could do sedentary work and her employer was accommodating [her] needs prior to leave of absence and agreed to continue to modify her occupation as needed." The employability analysis performed by Paul Broadus, M.A., on December 29, 2006, found Plaintiff was "unable to perform the duties of 'any gainful occupation for which she is recently fitted by education, training or experience' based on her continuing symptoms and impairments and the reports of her physicians." Aetna stated Plaintiff's entire file was reviewed by R. David Bauer, M.D., Board Certified Orthopedic Surgeon, with added Expertise in Spine Surgery. Dr. Bauer stated, "…all medical documentation was reviewed as well as letters from Ms. Garrison's friends and family. Dr. Bauer stated:

> Ms. Garrison's primary diagnoses were degenerative disc disease that was treated with a fusion from L3-L5. Ms. Garrison also had a history of L5 radiculitis, which healed and had a cervical degenerative disc disease, reported to be aggravated by a motor vehicle accident. The diagnostic testing that Ms. Garrison had does not show any significant functional limitations and the neurologist commented in his notes that Ms. Garrison had improved since her surgery.

> Ms. Garrison's attending physician does not provide any physical findings on examinations that were consistent with Ms. Garrison's complaints. The surveillance films do not demonstrate someone with pain behavior or that was limited in her range of motion. Based upon

Gordon & Rees LLP
633 West Fifth Street
Suite 4900
Los Angeles, CA 90071

the physical examinations performed, surveillance films and diagnostic testing there was no evidence of a severe impairment that would restrict Ms. Garrison from performing sedentary activity for an eight hour day.

Plaintiff's medical documentation, "did not continue to support a functional impairment" beyond June 29, 2006. Aetna affirmed its decision to terminate Plaintiff's LTD benefits and advised Plaintiff she had the right to bring an action under ERISA. . (0434-0436)

## B. CONCLUSIONS OF LAW

1. The legal framework for analyzing ERISA claims was recently altered by the Ninth Circuit Court of Appeals decision, *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955 (9th Cir. 2006). In *Abatie*, the Ninth Circuit concluded that where a plan administrator has been given discretion, the standard of review to be applied to the benefits determination is *always* abuse of discretion. *Id.* at 967. This is a departure from the Court's previous position that allowed for the possibility of applying a de novo standard of review despite explicit plan language granting an administrator discretionary authority.

2. However, the *Abatie* Court holds that conflicts of interest may be considered by the Court in its application of the abuse of discretion standard. The *Abatie* Court cautioned that when applying this abuse of discretion standard, the trial court's review should be "informed by the nature, extent, and effect on the decision-making process of any conflict of interest that may appear in the record." *Ibid.* More specifically, the trial court must "decide in each case how much or how little to credit the plan administrator's reason for denying insurance coverage." *Id* at 968. For example, the court may be less skeptical of an administrator's decision where a "structural" conflict is not accompanied by "any evidence of malice, of self-dealing, or of any parsimonious claims-granting history." *Ibid.* On the other hand, a trial court may be more skeptical where the plan administrator offers

Gordon & Rees LLP
633 West Fifth Street
Suite 4900
Los Angeles, CA 90071

1   inconsistent reasons for denial, fails to adequately investigate a claim or request

2   information from the plaintiff, fails to give proper credit to a plaintiff's reliable

3   evidence, or repeatedly denies benefits by misinterpreting the plan's language or

4   incorrectly making decisions contrary to the weight of the record. *Id*. at 968-69.

5       3.      From now on, evidence of a plan administrator's conflict, structural or

6   actual, should *always* be considered by the trial court when considering whether

7   discretion was abused.[1]

8       4.      Plaintiff asserted that Aetna's role as the claims review administrator

9   and payor/insurer of benefits caused it to operate under a conflict of interest. Prior

10  to *Abatie* courts viewed this dual role as evidence of merely a structural conflict of

11  interest. (*Friedrich v. Intel Corp.*, 181 F.3d 1105 (9th Cir. 1999). *Abatie* does not

12  change this ruling. In the wake of *Abatie*, this dual role amounts to no more than

13  evidence of a structural conflict, absent evidence of self-dealing, inconsistent

14  decision-making, or failing to properly investigate a claim. These examples of

15  conflicts of interest are completely absent from the instant record.

16      5.      In the instant case, the Plan provides Aetna with discretionary

17  authority to review benefits when it states:

18          For the purpose of section 503 of Title 1 of the Employee Retirement
            Income Security Act of 1974, as amended (ERISA), Aetna is a fiduciary
19          with complete authority to review all denied claims for benefits under this
            policy. In exercising such fiduciary responsibility, Aetna shall have
20          discretionary authority to:

21          Determine whether and to what extent employees and beneficiaries are
            entitled to benefits; and
22          Construe any disputed or doubtful terms of this policy.
            Aetna shall be deemed to have properly exercised such authority unless
23          Aetna abuses its discretion by acting arbitrarily and capriciously. (0021)

24

25  ─────────────
    [1]   The *Abatie* Court expressly rejected the "sliding scale" description used by
26  many other federal circuits when describing the degree of discretion given to a
    conflicted plan administrator's decision. *Id*. at 967-68. Under the "sliding scale"
27  approach, the degree of discretion given to the decision would go up or down
    depending upon the severity of the conflict as disclosed by the evidence. *Ibid*.
28  Although the *Abatie* Court disapproved of the *phrase* "sliding scale," finding "the
    metaphor unnecessary and confusing," it effectively adopted its application.

Gordon & Rees LLP
633 West Fifth Street
Suite 4900
Los Angeles, CA 90071

Gordon & Rees LLP
633 West Fifth Street
Suite 4900
Los Angeles, CA 90071

The language above vests Aetna with explicit, discretionary authority to review claim benefits. Accordingly, Aetna's decision to terminate Plaintiff's LTD benefits must be reviewed for an abuse of discretion.

6.     Aetna's determination that Plaintiff was not disabled from her own occupation is strongly supported by the totality of the evidence in the record. Furthermore, Aetna's investigation and handling of Plaintiff's claim starkly contrasts the self-dealing behaviors discussed by the *Abatie* Court. The examples of self-dealing cited by the *Abatie* court as acts that amount to actual conflicts of interest are wholly absent from the instant record.

7.     Aetna made extensive efforts to evaluate Plaintiff's claims. Aetna repeatedly requested medical records from Plaintiff and reviewed all records provided. (0259-0260, 0302-0303, 0257) Aetna obtained the professional opinions of two board certified physicians to review Plaintiff's claims, Dr. Cohen and Dr. Bauer. (0304-0315 and 0420-0422) Aetna's in-house physicians and disability analysts repeatedly reviewed and evaluated Plaintiff's claims and records. (0843-0844, 0849-0851, 0902-0905, 0926) Aetna's reviewing physicians determined Plaintiff was not disabled from her own occupation, they explained the inconsistencies in her records and in her treating physicians' reports. (0304-0315, 0420-0422) Aetna utilized the services of First Advantage to obtain video-taped surveillance of Plaintiff in order to better assess her capabilities. (1252) Aetna utilized vocational rehabilitation consultants to investigate Plaintiff's occupation in the general economy. (0318-0325, 0929-0930) It was confirmed that her occupation was sedentary in the general economy. (0920-0930) When Aetna learned Plaintiff was performing her job at Boeing in a sedentary capacity prior to her instant leave of absence, Aetna contacted Boeing to confirm that any and all accommodations would be available to her upon a return to work. (1291) These extensive efforts support a finding that Aetna acted in good faith and more than adequately investigated Plaintiff's claims. Aetna conducted a full and fair

Gordon & Rees LLP
633 West Fifth Street
Suite 4900
Los Angeles, CA 90071

investigation of Plaintiff's claims pursuant to the terms of her LTD Plan and available evidence.

8.      Aetna consistently informed Plaintiff of the criteria she needed to meet in order to continue to receive benefits, and requested copies of her treating physicians' records. (0083-0084, 0076-0079, 0129-0130, 0259-0260, 0302-0303, 0353-0356, 0364-0365, 0375-0376, 0380-0413)   In Aetna's termination letter, Aetna advised that it reviewed Plaintiff's medical records and that her MRI was essentially normal. (0353-0356)  Aetna explained how it determined that Plaintiff's occupation, and prior position at Boeing, were sedentary.  (0353-0356)  During the appeals process, Aetna corresponded with Plaintiff on multiple occasions, and provided her and her legal counsel with copies of the documents and video-taped surveillance that it relied upon in reaching its claim determination. (0364-0365, 0375-0376, 0380, 0413) Aetna advised Plaintiff of additional information she could submit with her appeal on more than one occasion. (0353-0356, 0364-0365)  The foregoing communications are exemplified in Aetna's letters dated June 17, 2004, July 10, 2004, June 30, 2005, April 17, 2006, May 5, 2006, July 5, 2006, July 24, 2006, November 20, 2006, December 13, 2006, and January 3, 2007.  (0083-0084, 0076-0079, 0129-0130, 0259-0260, 0302-0303, 0353-0356, 0364-0365, 0375-0376, 0380-0413)  Aetna also had verbal communications with Plaintiff which are reflected in screen prints in the administrative record. (0659-0660, 0661, 0666-0671, 0688-0693, 0733, 0737, 0744, 0794-0798, 0942-0943, 0976) Plaintiff was informed of Aetna's rationales for terminating her LTD benefits and could contest them at the administrative level.

9.      Plaintiff's treating physicians' records contain contradictory findings and support Aetna's determination that Plaintiff was not disabled from her own occupation.  For example, Dr. Gehret's report dated March 3, 2005, states that

-18-

Gordon & Rees LLP
633 West Fifth Street
Suite 4900
Los Angeles, CA 90071

"Plaintiff's left L5 radiculopathy improved from surgery" and that her EMG/NCV studies showed she made "an excellent recovery and is normal at this time." (0107-0109) Dr. Dennis' report dated March 10, 2006, states Plaintiff's MRI from January 13, 2006, showed "degenerative disk disease at C4-5 and C5-6, nothing of major consequence." (0244) Dr. Dennis repeatedly reported that "there was no medical contraindication for Plaintiff to participate in a vocational rehabilitation program." (0083-0084, 0076-0079, 0129-0130, 0259-0260, 0302-0303, 0353-0356, 0364-0365, 0375-0376, 0380-0413) On April 3, 2006, Ms. Gibille stated Plaintiff was "previously very active, and has resumed much of her normal routine, along with exercising as she had in the past. She has done better with this and she reports her neck feels better with this as well." (0537-0538) Plaintiff's own treating physicians interpret and/or reference objective evidence such as EMG/NCV studies and her MRI in a manner that is inconsistent with her claims of severe and disabling pain. Plaintiff's treating physicians' reports contain findings that contradict her claims of pain, and these reports, in part, informed Aetna's decision to terminate Plaintiff's LTD benefits.

10. The surveillance videos taken of Plaintiff contradict her complaints of severe, disabling pain. Aetna obtained the services of an outside agency, First Advantage, to conduct video-taped surveillance of Plaintiff on May 8th, 9th, 15th, and 16th of 2006. (1252, 0326-0331, 0317-0325) The video-taped surveillance shows Plaintiff voluntarily bending fully at the waist and for surprising amounts of time considering her allegedly severe back pain. (1252) She is observed twisting her neck while bent over, getting in and out of her Mercedes, which is low to the ground, without any pain behaviors, and waking around fluidly and upright without the use of assisting devices. (1252) Plaintiff's demonstrated range of motion, without any pain behaviors, is inconsistent with her claims of severe, disabling neck, back, and leg pain. (1252, 0420-0422, 0304-0315) Aetna reasonably considered this objective evidence as part of its review.

-19-

Gordon & Rees LLP
633 West Fifth Street
Suite 4900
Los Angeles, CA 90071

11.     Prior to terminating Plaintiff's benefits, Aetna reasonably ascertained that Plaintiff's occupation was sedentary in the general economy. (0927-0924, 0727-0728)  In order to be considered disabled, Plaintiff's Plan required that she be disabled from her "own occupation" in the general economy, not her specific position at Boeing. (0083-0084) This was communicated to Plaintiff in letters dating as far back as June 17, 2004.  (0083-0084) Plaintiff's occupation corresponds most closely to the U.S. Department of Labor's job category of "Manufacturing Engineer, Chief/Director, Research and Development" which is classified as sedentary in the general economy.  (0927-0929)

12.     Aetna determined that Plaintiff was performing her job at Boeing in a sedentary capacity prior to her instant disability claim. (0727-0728, 0929-0930, 0458)  Screen prints dated September 14, 2004, indicate Aetna contacted Plaintiff's employer to find out if accommodations were available for her at work in order to develop a return to work plan for her doctor's consideration.  (0727-0728) Boeing's Superintendent, Steve Marion, stated, "…accommodations are certainly available in any capacity as [she] is a department director.  She was not doing any traveling prior to LOA, and would continue with no travel, no lifting, or any activity that would aggravate her condition…job tasks are her own office onsite with office support."  (0727-0728)  Thus, Aetna's determination is supported by the evidence contained in the record.

13.     Aetna contacted Boeing again in 2006 to ensure that Boeing would be able to accommodate Plaintiff's work restrictions.  (1291) Plaintiff's former supervisor stated that, "any and all accommodations are available" and that she was "welcome" to return to work "in any capacity."  (1291) Accordingly, Plaintiff would have performed her job at Boeing in a sedentary capacity had she returned to work.

14.     Significant evidence contradcits Plaintiff's complaints of pain, including her own treating physicians' records, the opinions of two board-certified

-20-

physicians who reviewed Plaintiff's claims, objective evidence such as MRIs and neurological exams, and video-taped surveillance that shows Plaintiff bending fully at the waist while turning her neck, walking fluidly and upright, and getting in and out of her low-to-the-ground car without any pain behaviors. (1291, 0107-0109, 0244, 0537-0538, 0326-0331, 0317-0325, 0304-0315, 0420-0422) Accordingly, Aetna's decision to terminate Plaintiff's benefits is reasonably grounded upon, and strongly supported by, the totality of the evidence contained in the administrative record.

## DISPOSITION

1.     If any of the foregoing Conclusions of Law are also Findings of Fact, they are incorporated into the above Findings of Fact.

2.     Each Conclusion of Law is severable from each and every other Conclusion of Law.

3.     The court finds that while there is a "structural" conflict in light of Aetna's dual role as the funding source of benefits and the claims review fiduciary, such conflict is not accompanied by "any evidence of malice, of self-dealing, or of any parsimonious claims-granting history." *Furthermore,* Aetna did not offer inconsistent reasons for the denial of plaintiff's claim, not did it fail to adequately investigate the claim or fail to request information from the plaintiff, or fail to give proper credit to a plaintiff's reliable evidence. Aetna neither misinterpreted the plan's language to deny benefits, nor incorrectly made decisions contrary to the weight of the record.

4.     Based upon a review of all of the evidence, this court finds that Aetna did not abuse its discretion when it denied Plaintiff's claim for disability benefits.

5.     Therefore**,** the Court enters judgment in favor of Defendants.


Dated: _____, 2007          By: _____
                                      Honorable John F. Walter

Gordon & Rees LLP
633 West Fifth Street
Suite 4900
Los Angeles, CA 90071

AETNA/1045684/5356566v.1