FRANK N. DARRAS #128904
Email: fdarras@sbd-law.com
LISSA A. MARTINEZ #206994
Email: lmartinez@sbd-law.com
SHERNOFF BIDART & DARRAS, LLP
3257 East Guasti Road, Suite 300
Ontario, CA 91761
Telephone: (909) 390-3770
Facsimile: (909) 974-2121

Attorneys for Plaintiff
CARI GARRISON

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CARI GARRISON,<br><br>Plaintiff,<br><br>vs.<br><br>AETNA LIFE INSURANCE COMPANY; THE BOEING COMPANY EMPLOYEE HEALTH AND WELFARE BENEFIT PLAN,<br><br>Defendants. | Case No.: CV07-3094 JFW(Ex)<br><br>[PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW; [PROPOSED] ORDER THEREON<br><br>Judge: Hon. John F. Walter<br>Date: February 26, 2008<br>Time: 8:30 am<br>Ctrm: 16 |

Plaintiff, Cari Garrison, hereby submits the following [Proposed] Findings of Fact and Conclusions of Law in the above referenced matter.

## I. PROPOSED FINDINGS OF FACT

### A. The Plan

1. As an employee of The Boeing Company, plaintiff Cari Garrison was a participant in the Defendant Plan, and insured under The Boing Company Life and Disability Plan, an employer sponsored benefit insured by Aetna Group Life and Long Term Disability Insurance Policy GP-728777 (the "Plan"). (Ex. A, 1-45.)[1] The Plan provides LTD benefits after a 26 week Waiting Period (during which STD benefits are paid), in an amount equal to 50% of monthly predisability earnings, less any amounts received from other sources such as state disability, Social Security or Workers Compensation. Benefits are payable until the claimant's normal retirement age, which in Ms. Garrison's case is age 66. (Ex. A, 42-43.)

2. The Plan defines total disability during the first 30 months as the inability "to perform the material duties of your own occupation; except that if you start work at a reasonable occupation you will no longer be deemed totally disabled." After the first 30 months, total disability means the inability "to work at any reasonable occupation." (Ex. A, 26.) Reasonable Occupation is defined as "any gainful activity for which you are, or may reasonably become, fitted by education, training, or experience." (Ex. A, 26.) The Plan does not define own occupation; nor does it contain an "objective" evidence requirement. (Ex. A, 1-45.)

### B. Ms. Garrison's Pre-Disability Occupation

3. Ms. Garrison was employed with Boeing for approximately 23 years. Due to her demonstrated dependability, dedication, strong leadership skills, the

---

[1]. Citations to supporting evidence are made to the Administrative Record previously lodged by defendants in this case, with the omission of the prefix "AET." All references to Exhibits will be to the exhibits attached to the Declaration of Lissa A. Martinez and contained in Exhibit Binder.

PLAINTIFF'S [PROPOSED] FINDINGS OF FACT & CONCLUSIONS OF LAW; [PROPOSED] ORDER

consistent quality of her work and her ability to "think outside of the box," she was promoted several times, selected to participate in a number of programs for future executives (including the Lead and High Potential Programs) and received a number of achievement awards, including stock options, stock certificates, performance bonuses and certificates. (Ex. C, 456-457.)

4.  Prior to her disability, Ms. Garrison was the Director of Supplier Management for the FCS [Future Combat Systems] Program, which remains the largest Boeing program, worth several billion dollars. Ms. Garrison's position required long hours, significant travel, and high-level analytical and problem solving abilities. She was asked to lead a project that neither Boeing nor the Army had ever done before. It involved a completely new way of doing business, pulling together some 750 individuals, and managing a simultaneous multi-source selection process with subcontract management locations in California, Alabama, Washington, Florida and Pennsylvania. It required working seven days a week for months, generally 12-16 hour days, with frequent travel. Ms. Garrison got the job done, but it took a toll on her physically, requiring the daily use of Vioxx and Vicodin. Her managers knew she was in pain and tried to accommodate her as much as possible by holding meetings in her office, allowing her to change positions frequently, and traveling for her whenever possible. (Ex. C, 456-460.)

5.  Ms. Garrison ceased working as of January 29, 2004 to undergo back fusion surgery due to disc herniation and symptoms of low back pain, degenerative disc disease of the lumbar spine and radiculitis. At the time, her annual base salary was $138,300. (Ex. B, 49.)

C. **Ms. Garrison's Disabling Medical Condition**

6.  Ms. Garrison had a ten year history of back pain prior to undergoing this fusion surgery. She had previously tried chiropractic treatment, physical therapy, epidural injections and medications. In April of 2001, she underwent a microdiscectomy, which provided only short-term relief. (Ex. C, 457.)

PLAINTIFF'S [PROPOSED] FINDINGS OF FACT & CONCLUSIONS OF LAW; [PROPOSED] ORDER

7.      In September of 2003, Ms. Garrison sought treatment from Dr. Steven Dennis, board-certified Orthopedic Surgeon, who recommended she undergo fusion surgery. On January 29, 2004, Ms. Garrison underwent an anterior lumbar interbody fusion L3-L5, with interior screws, and posterior decompression at L3-L5, with discectomy at L4-L5. The risks and complications of this complex surgery include nerve injury, chronic pain and disability. (Ex. Q, 539-540.)

8.      Although Ms. Garrison reported improvement in her back pain after surgery, she experienced excruciating left leg pain, which was attributed to the nerve being stretched during surgery to accommodate a new larger spine – she was ¾ inch taller after the fusion surgery. In spite of her best efforts, Ms. Garrison's leg pain never resolved. (Ex. C, 458.)

### D.     Ms. Garrison's Disability Claim

9.      On February 3, 2004, Aetna confirmed that Ms. Garrison's claim for STD benefits had been approved. (Ex. F, 52-54.) Aetna ultimately paid STD benefits through July 28, 2004 (the maximum benefit period) before it referred her claim to an LTD analyst for review. (Ex. F, 69-70.)

#### 1.      Ms. Garrison's Occupational Duties

10.     On February 13, 2004, Ms. Garrison's supervisor completed a Physical Demand Analysis indicating that her position as a Director, Supply Management, FCS requires "continuous" (67-100% or 5.1-8 hrs per day) sitting; "occasional" (1-33%) climbing, kneeling, lifting, pulling, reaching above shoulder level, forward reaching, carrying, bending, twisting, hand grasping, gross manipulation, standing, stooping, and walking; "occasional" (1-33%) lifting up to 20 lbs; 80% of the day spent on the phone and computer; a usual work shift was 12 hours; and overtime was required. (Ex. B, 56.)

11.     Aetna was also given Ms. Garrison's job description: "Perform responsibilities requiring the integration of disciplines from more than one supplier management and procurement job family and applied independent, specialized

technical expertise to support a wide range of business objectives. Activities include, but are not limited to, the development, integration, implementation, and execution of multidisciplinary business processes. Works cross-functionally with internal and external customers and suppliers and all employee levels to carry out responsibilities." (Ex. B, 58.)

12. On May 6, 2004, Ms. Garrison informed Aetna that her job requires travel and fourteen hour days. (Ex. T, 666.) This was confirmed on June 17, 2004 during the Initial Telephone Interview as Ms. Garrison explained that "she would work 14 hour days and on her last project she worked 7 months w/o a day off ... Her occ required a lot of travel as well." (Ex. T, 689-693.)

13. As part of her claim documentation, Ms. Garrison completed a "Work History and Education Questionnaire" on June 28, 2004. She indicated that as a Director, FCS Supplier Management, her duties and responsibilities include: "Management of all FCS Supplier Mgmt activities contained in numerous locations throughout the US. FCS is the largest program within Boeing with huge demands to perform ... position requires long hours, significant travel in an extremely high stress environment." She also indicated that she is "unable to travel or work excessive hours; unable to remain in one position for more than 30 minutes [and] frequently needs to lie down." She is "still experiencing significant pain in lower back & left leg. Daily fatigue & pain would prevent even an 8 hr. day." (Ex. B, 72-73.)

### 2. Ms. Garrison's Physicians Confirm Disability

14. On June 8, 2004, Dr. Dennis completed an Attending Physician's Statement ("APS") certifying Ms. Garrison's total disability, with the following diagnosis: 1) DDD [Degenerative Disc Disease] of the Lumbar Spine; 2) Radiculitis; 3) Spondylolisthesis. He documented subjective symptoms of "severe low back pain" and objective findings of "X-rays and MRI" showing "DDD, stenosis and HNP." He prescribed Vicodin and rated her Physical Impairment as

"Class 5 – Severe limitation of functional capacity; incapable of minimal (sedentary) activity." (Ex. D, 67-68.)

15. On June 17, 2004, Ms. Garrison informed Aetna that her doctors have advised her that "with the fusion, cadaver bone, and 'tons of hardware' it's normal that it will take longer for recovery from this surgery." She explained that her doctor thought the reason for her continued leg pain is that the nerve on her left leg had to be stretched quite a bit to fit when the surgery was performed – "claimant is now ¾ inch taller than before the surgery." She advised that she takes Neurontin (3 per day), a muscle relaxer and Vicodin, and "has a hard time staying in any one position for very long." (Ex. T, 689, 690, 692.)

16. Aetna wrote to Ms. Garrison on June 17, 2004, and advised that it was reviewing her claim for LTD benefits. (Ex. G, 83-84.) Aetna, however, misrepresented the terms of the Plan when it incorrectly stated that the Plan defined disability during the first 30 months as the inability to perform "the material duties of your own occupation <u>or other appropriate work Boeing may make available to you</u>." (Ex. G, 83 (emphasis added).) Aetna further misrepresented the terms of the Plan by referencing a definition of "own occupation" that is not contained in the Plan:

> "Own occupation means your occupation as it exists in the general economy and not your specific job at Boeing. In reviewing your eligibility for LTD benefits, the issue upon which we must focus is whether or not you have the ability to perform the material duties of your own occupation with reasonable continuity for any employer in the general economy." (*Id.*)

17. Less than one month later, Aetna advised that LTD benefits had been approved. In the meantime, it also determined that Ms. Garrison's occupational physical demands were in the "Light" category: "Claimant's occ ... requires constant sitting, occasional stand, walk and lifting up to 20 lbs occasionally (Light Level)." (Ex. T, 698.) Note that despite not having any travel listed as an occupational requirement, Aetna still determined that Ms. Garrison's occupation

was "Light." In another entry, Aetna again confirmed Ms. Garrison's occupation as "Light": "Occupational PDAW/JD dated 2-13-04 reveals occ in light category (constant sit, occasional walk, stand, stoop, kneel, carry, bend, twist. Occasional lift up to 20 pounds); Claimant advised occ requires lots of travel." (Ex. T, 700.)

18. On July 10, 2004, Ms. Garrison's claim for LTD benefits was approved."[2] (Ex. H, 76-79.) In the approval letter, Ms. Garrison was notified that the Plan had a change in the definition of disability after 24 months of LTD benefits. As of July 29, 2006, the Plan requires that she meet a more strict "any occupation" definition of disability. Aetna once again misrepresented the terms of the Plan when it incorrectly stated that Ms. Garrison "<u>must provide objective medical evidence</u>" in support of her disability from any occupation. (Ex. H, 76 (emphasis added).)

19. On September 14, 2004, Aetna once again documented that Ms. Garrison's occupational demands were "light," with a subsequent entry that "accommodations are ... available" and "ER very eager to get EE back to work ASAP." (Ex. T, 719-720, 728-729.)

20. On January 31, 2005, Dr. Dennis completed another APS with diagnoses of degenerative disc disease of the lumbar spine and radiculitis with back pain, leg pain and numbness; medication included Celebrex. Dr. Dennis documented that Ms. Garrison has "no ability to work, severe limitation of functional capacity; incapable of minimal activity." He gave restrictions and limitations to include "no lifting, no bending, no stooping" and indicated that objective findings include back and leg pain with inability to sit or stand for prolonged periods. He documented "zero" hours that she is capable of working in a day and "zero" number of days that she is able to work. (Ex. D, 101-102.)

21. On March 3, 2005, Ms. Garrison was examined by David A. Gehret,

---

[2] Aetna also advised that Ms. Garrison was eligible for continuation of her life insurance policy due to her disability. (Ex. H, 80-81.)

SHERNOFF BIDART DARRAS
LAWYERS FOR INSURANCE POLICYHOLDERS
600 S INDIAN HILL BLVD CLAREMONT CA 91711 TEL 909 621 4935

MD, Diplomate of American Board of Neurology, who noted current complaints of aching pain in hip and thigh, with intermittent numbness in the foot, and occasional tingling in the calf. Dr. Gehret documented that she has also been referred by Dr. Dennis to Dr. Robert Johnson, a psychiatrist who placed her on Trazodone. The patient informed Dr. Gehret that she would like to return to some form of work. Dr. Gehret opined that the back pain was not emanating from the lumbar spine since her EMG/NCV studies were normal. He diagnosed her with iliotibial tendonitis/fasciitis and gave her a trial of Naprosyn. He also ordered physical therapy with a diagnosis of left iliotibial band pain and irritation. (Ex. Q, 107-110.)

22. On March 10, 2005, a Lumbar Spine Evaluation was performed by Michael Mandas, PT from Los Amitos Orthopedic and Sports Physical Therapy. Mr. Mandas documented that Ms. Garrison has been experiencing pain in her left hip and lateral thigh since undergoing lumbar fusion on January 29, 2004. The pain has gradually worsened and interfered with function and with work. The pain is aggravated by standing, sitting, and walking. Her medication includes Naproxen. Examination revealed moderate tenderness at the distal 1/3 of the left iliotibial band; moderate myofascial tightness in the left tensor fasciae latae and Gluteus Medius and Maximus; positive Ober test; positive Thomas Test; lumbar spine range of motion: Flexion 70%; Extension 20%; R & L Rotation NT; Right Lateral Flexion 50%; Left Lateral Flexion 50%. His assessments include: 1) status post lumbar fusion; 2) positive ilio-tibial band syndrome: 3) positive hip flexor and tensor fasciae latae; 4) establish pain control strategies. (Ex. Q, 111-112.)

23. On March 31, 2005, Dr. Dennis <u>disagreed</u> with Aetna's proposed Return to Work ("RTW") Plan, stating that Ms. Garrison is "unable to work" despite Aetna's contentions that her occupation is "SEDENTARY" because it involved office work, no travel and accommodations are available. (Ex. E, 115.) Dr. Dennis also disagreed with Aetna's subsequent RTW Plans as noted in his responses dated June 9, 2005 and January 27, 2006. (Ex. E, 125, 196.)

24.  Complicating her medical condition, and contributing to the disabling pain that she was already suffering, on April 18, 2005, Ms. Garrison was involved in a significant motor vehicle accident when she was hit from behind at a high rate of speed by a very large SUV. As Dr. Dennis documented during his April 22, 2005 examination, she "has had a lot of stiffness and soreness beginning shortly after the accident." Dr. Dennis prescribed physical therapy to the cervical and lumbar areas. (Ex. Q, 117-118.)

25.  On June 3, 2005, Michael Mandas, PT, performed a Cervical Spine Evaluation due to neck and right shoulder pain since the April 18th car accident. He documented aggravating factors of "standing, sitting, lifting and head movement," and current medications of Vicodin, Naproxen and Trazadone. His assessments include: 1) Pain in the cervical neck and radiating in to the right shoulder; 2) Limited range of motion cervical spine with segmental restrictions; 3) Mild to moderate muscle weakness in the cervical spine; 4) Painful ADL's. (Ex. Q, 120.) On June 6, 2005, Ms. Garrison informed Aetna that she was involved in a car accident on April 18th and was suffering from whiplash. (Ex. T, 771.)

26.  Ms. Garrison continued to treat with Dr. Dennis for low back, leg and neck pain. Dr. Dennis prescribed ongoing physical therapy, and pain and anti-inflammatory medications, including: Valium, Naprosyn and Neurontin. (Ex. Q, 133, 138, 142, 143, 145, 146, 153, 154, 185, 191.)

27.  On October 31, 2005, Ms. Garrison informed Aetna that her daily activities were limited by her ability to push herself and that she needed breaks to complete activities. She continued with physical therapy and her medications included Neurontin, Naprosyn and Valium. According to her attending physician, she will never be able to work 40 hours a week. (Ex. T, 796-798.)

28.  On January 27, 2006, Ms. Garrison was examined by Dr. Dennis who documented that she "continues to have significant mechanical pain in her cervical spine with radiation into the shoulder, particularly on the left side." (Ex. Q, 197.)

PLAINTIFF'S [PROPOSED] FINDINGS OF FACT & CONCLUSIONS OF LAW; [PROPOSED] ORDER

Dr. Dennis also completed an APS on this date which documented diagnoses of cervical degenerative disc disease and lumbar degenerative disc disease, with objective findings of "neck pain, upper extremity pain, numbness, headaches, [and] low back pain." Treatment included rest, acupuncture and medications – Neurontin, Naprosyn and Valium. He indicated that Ms. Garrison was motivated to work but was unable to do so. (Ex. D, 198-200.)

29. Ms. Garrison was also evaluated by Lisa Gibilies, M.S., Licensed Acupuncturist, on January 27, 2006, for Cervical Spine Strain/Sprain, Pain, Impaired Mobility and Function. It was documented that Ms. Garrison reported neck and shoulder pain as deep ache, constant at 7 of 10. Examination of the musculoskeletal system revealed slow and guarded range of motion in all ranges; Onset of numbness is positional, forward head posture; Palpation: overall reduced joint mobility in C/S, right UT, suboccipital, SCM (sternocleidomastoid) muscles are all hard, tight, and fibrotic. (Ex. Q, 201-202.)

30. On February 13, 2006, an MRI of the Cervical Spine revealed degenerative disk disease at C4-5 and C5-6. (Ex. Q, 244.)

31. On March 24, 2006, Ms. Garrison provided Aetna with a current list of her medical providers and indicated that she was taking the following medications: Neurontin,[3] 900 mg/day; Naprosyn,[4] 1000 mg/day; Valium,[5] 5 mg/day; Trazodone,[6] 50 mg/day; and Vicodin,[7] 500 mg as required. (Ex. B, 245-

---

[3] Side effects include: Drowsiness, dizziness, unsteadiness, fatigue, vision changes and constipation.
[4] Side effects include: Ringing in the ears headaches, dizziness, drowsiness, abdominal pain, nausea, diarrhea, constipation, heartburn, fluid retention and shortness of breath.
[5] Side effects include: Drowsiness, fatigue and ataxia (loss of balance).
[6] Side effects include: Nausea, dizziness, insomnia, agitation, tiredness, dry mouth, constipation, lightheadedness, headaches, low blood pressure, blurred vision and confusion.

PLAINTIFF'S [PROPOSED] FINDINGS OF FACT & CONCLUSIONS OF LAW; [PROPOSED] ORDER

247.)

32. Ms. Garrison also completed Authorizations for financial and medical information, along with a Work History and Education Questionnaire, indicating that she is "unable to maintain standing, sitting or walking for extended periods (in excess of 30-60 min). Travel is extremely difficult – unable to lift or transport luggage. Need frequent rest periods during the day." (Ex. B, 248-255.)

33. On April 7, 2006, Ms. Garrison was examined by Dr. Dennis who documented that she "continues to have mechanical symptoms with radiating thigh pain ... also has issues with her cervical spine ... and still has persistent and ongoing soft tissue symptoms that are not resolved with intermittent radiculitis." He opined that "she will never return to work at her former job with Boeing due to the mandatory number of hours, travel, prolonged sitting for computer work and meetings." (Ex. Q, 256.)

34. On May 8, 2006, Ms. Garrison informed Aetna that she had an epigastric hernia repair on May 5, 2006 performed by Dr. David Crnic. Ms. Garrison gave Aetna Dr. Crnic's phone number, yet Aetna failed to obtain any medical records. (Ex. T, 866.)

E. **Aetna's Denial Of Ms. Garrison's Claim**

33. On July 5, 2006, Aetna notified Ms. Garrison that it was terminating her LTD benefits effective June 29, 2006 as she was not "unable to perform [her] own occupation."[8] Aetna relied extensively on a suspect IME Report prepared by Elite Physicians/NMR's Dr. Mitchell Cohen and an incorrect job classification based on an "own occupation" definition not contained in the Plan and improper consideration of work-place accommodations. (Ex. I, 353-356.)

---

[7] Side effects include: Nausea, vomiting, constipation, lightheadedness, dizziness, drowsiness, flushing, vision changes and mental/mood changes.

[8] Aetna also advised that due to the termination of her LTD claim she was no longer eligible for continuation of her group life insurance. (Ex. I, 357-358.)

### 1. The Suspect IME Report

34. In May 2006, Aetna arranged an examination of Ms. Garrison through Elite Physicians/NMR[9]. The IME was performed on May 16, 2006 by Dr. Mitchell Cohen (Ex. L, 304-316), who documented in his Report current complaints of "constant aching sensation across her low back [and] constant shooting pain in her left leg ... Her low back pain increases with any prolonged position/movements, such as sitting, walking or standing ... she has numbness and tingling in her left calf and foot." She also has "constant aching pain across her posterior neck radiating into her right shoulder [and] numbness in both hands." Dr. Cohen listed Current Medications: Neurontin, Naprosyn, Valium, Vicodin; and Prior Surgeries: None. (Ex. L, 306-307.) Dr. Cohen diagnosed: 1) Cervical musculoligamentous strain; 2) Status post anterior posterior fusion of the lumbar spine. (Ex. L, 313.) Dr. Cohen concluded:

> "The patient's examination today is essentially normal ... She has good range of motion of the cervical and lumbar spine ...
>
> It is my opinion, the patient should be able to perform a sedentary physical demand level for 8 hours a day and 40 hours a week. I can find no medical reason that would prevent this patient from doing a sedentary type of job. This is a normal activity of daily living, that most likely, she is doing at this time. She should be allowed to change position at will to avoid prolonged sitting or standing to avoid exacerabating her low back symptoms." (Ex. L, 314.)

35. Dr. Cohen also completed a Capabilities and Limitations Worksheet indicating that Ms. Garrison can perform "occasional" sitting (no more than a total of .5 to 2.5 hours during the day) and can never lift 11-20 lbs (or more). Dr. Cohen certified that these restrictions were "permanent." (Ex. L, 316.)

37. On June 13, 2006, Ms. Garrison asked Aetna to send a copy of Dr.

---

[9] Aetna paid Elite Physicians/NMR $1,495.00 for the IME. (Ex. L, 347.)

PLAINTIFF'S [PROPOSED] FINDINGS OF FACT & CONCLUSIONS OF LAW; [PROPOSED] ORDER

Cohen's Report to Dr. Dennis for review. (Ex. J, 348.)

### 2. Aetna Incorrectly Classifies Ms. Garrison's Occupation As Sedentary

38. On June 13, 2006, Aetna once again documented that Ms. Garrison's occupational demands were "Light": "EE's own occupation is considered light in general economy." (Ex. T, 905.)

39. On June 23, 2006, Aetna documented "after review of EE's job/occ, it was determined that travel was part of ee's description. As travel would be in the light physical demand category and EE restricted to sedentary per IME and RMD, would need to add restriction of no travel to EE's capabilities and limitations." (Ex. T, 915.)

40. Based on representations by Ms. Garrison's employer that prior to her disability, accommodations had been made for no travel, and that her employer was willing to continue to provide such accommodations, Aetna asserted that her occupation was sedentary and decided to terminate her claim. (Ex. T, 930.)

41. On July 5, 2006, Aetna wrote to Ms. Garrison and advised that her claim was being denied effective June 29, 2006. (Ex. I, 353-356.) Aetna once again misrepresented the terms of the Plan when it incorrectly stated that disability was defined during the first 30 months as the inability to perform "the material duties of your own occupation <u>or other appropriate work regardless of whether that job is currently available.</u>" (Ex. I, 353 (emphasis added).)

42. Aetna further misrepresented the terms of the Plan by looking at Ms. Garrison's "own occupation as it exists in the general economy, not in your specific job." (Ex. I, 354.)

43. According to the denial letter:

"[W]e determined that your occupation in the general economy would be classified as sedentary work demand. We contacted your employer and it was determined that prior to your leave of absence your own job was being performed in the sedentary work demand. Previously your job demanded

PLAINTIFF'S [PROPOSED] FINDINGS OF FACT & CONCLUSIONS OF LAW; [PROPOSED] ORDER

that you travel, but your employer had accommodated no traveling and is willing to continue to accommodate the restriction of no traveling. When determining if you continue to meet the definition of disability, we must determine if you are capable of performing your own occupation as it exists in the general economy, not in your specific job ... we have determined that your occupation as Director of Supply Management as performed in the general economy and as can be accommodated at your employer is sedentary. (Ex. I, 354.)

44. Aetna further explained that based on Dr. Cohen's opinion that Ms. Garrison was able to work in a sedentary level for an 8 hour day, with the ability to change positions at will to avoid prolonged sitting or standing, that she was able to perform her own occupation. (Ex. I, 354-355.)

45. On July 11, 2006, Ms. Garrison informed Aetna upon discussing the termination of her claim that it is not true that she did not travel prior to going out on claim. (Ex. T, 943.)

F. **Ms. Garrison Submits An Appeal With Extensive Records Supporting Disability**

46. On December 28, 2006, Ms. Garrison submitted an 18-page appeal, explaining that she is disabled due to degenerative disc disease of the lumbar spine and the cervical spine, chronic pain, and the side effects of the medications used to try to control the pain. (Ex. N, 437-454.) In support of her appeal, Ms. Garrison enclosed testimonials, medical records (Ex. Q, 512-540), pharmacy records which evidence Ms. Garrison's extensive use of Neurontin, Naprosyn, Valium and Vicodin (Ex. R, 541-569), medical literature articles relating to ongoing pain in post-operative back surgery patients, and an Employability Analysis completed by Paul Broadus, M.A., a vocational expert, that confirmed Ms. Garrison "is unable to perform the material and substantial duties required by her own occupation as a Director, Supplier Management, either by her own employer, or as performed in the national economy." (Ex. P, 589-594.)

47. Ms. Garrison also submitted Dr. Dennis' IME Response, in which he

PLAINTIFF'S [PROPOSED] FINDINGS OF FACT & CONCLUSIONS OF LAW; [PROPOSED] ORDER

explained that Ms. Garrison suffers from chronic lumbar, sciatica and cervical pain caused by degenerative disk disease. She has functional limitations due to pain, can not sit, stand or walk for any length of time without changing positions, and is unable to focus for any length of time that would allow her to function on a level necessary to perform in her occupation. Dr. Dennis concluded that "I do not feel Ms. Garrison will ever be able to return to her previous line of work." (Ex. O, 414-415.)

### G. Aetna's Denial Of Ms. Garrison's Appeal

48. In response to Ms. Garrison's appeal, Aetna requested a medical records review from MES Solutions.[10]

49. The record review was performed by Dr. David Bauer,[11] who noted that Ms. Garrison had a sedentary job classification and opined that "there are no objective findings on physical examinations by the attending physicians or the FCE examiner, or the surveillance films,[12] or diagnostic testing." (Ex. S, 420-422.)

50. On February 9, 2007, Aetna wrote to Ms. Garrison and upheld the denial of her claim. (Ex. K, 434-436.) For the very first time, however, Aetna actually stated the correct definition of disability during the first 30 months: the inability to perform "the material duties of your own occupation; <u>except that if you start work at a reasonable occupation you will no longer be deemed totally disabled.</u>" (Ex. K, 434 (emphasis added).)

---

[10] MES Solutions performs medical reviews for insurance companies, including Aetna, Prudential, MetLife, Cigna and Hartford. (Ex. U, Bahnam Depo., 59:18-60:6.) In 2007, MES Solutions performed 1,020 medical reviews for Aetna, averaging 85 reviews a month (Ex. U, Bahnam Depo., 58:16-59:6.)

[11] Dr. Bauer has performed 1,261 medical reviews for MES Solutions since January 2005, 30 of which were done for Aetna. (Ex. U, Bahnam Depo., 50:15-51:12, 54:10-20.)

[12] Aetna ordered surveillance on Ms. Garrison in May 2006. But after 5 days of surveillance (45 hours and 48 minutes of surveillance), Aetna only obtained 11 minutes and 9 seconds of video. (Ex. M, 317-331.)

51. Relying on Dr. Bauer's opinion, Aetna determined that "there was no evidence of a severe impairment that would restrict Ms. Garrison from performing sedentary activity for an eight hour day." (Ex. K, 436.)

## II. CONCLUSIONS OF LAW

1. This claim involves a claim for employee welfare benefits and is governed by the Employee Retirement Income Security Act of 1974 (hereinafter "ERISA"). The defendant Plan is an employee welfare benefit plan within the meaning of ERISA § 3(1), 29 U.S.C. § 1002(1).

2. In reviewing Aetna's denial of Ms. Garrison's claim, the court applies an abuse of discretion standard of review tempered with "skepticism" based on Aetna's structural conflict as both the claims administrator and payor of benefits. The court weighs Aetna's structural conflict along with other evidence tending to show the "nature, extent and effect" that Aetna's conflict had on the claim decision. *Abatie v. Alta Health & Life Ins. Co*, 458 F.3d 95, 965-68 (9th Cir. 2006).

3. In conducting this inquiry, courts may weigh the conflict more heavily if presented with evidence of, *inter alia*, self-dealing, failure to adequately investigate a claim, failure to credit a claimant's reliable evidence, or inconsistent plan interpretations. *Abatie*, 458 F.3d at 968-69. A court may also consider whether the administrator used a "truly independent medical examiner or a neutral, independent review. *Id.* at 969, n. 7. This evidence is not limited to the administrative record. *Id.* at 970.

4. A claims administrator abuses its discretion if it relies on clearly erroneous findings of fact or construes plan provisions in a manner that conflicts with the plain language of the Plan. *Taft v. Equitable Life Assur. Soc.*, 9 F.3d 1469, 1473 (9th Cir. 1994).

5. The Ninth Circuit recently explained with regards to subject complaints of pain, that if the insurer "is turning down [the claimant's] application for benefits based on [her] failure to produce evidence that simply is not available,

PLAINTIFF'S [PROPOSED] FINDINGS OF FACT & CONCLUSIONS OF LAW; [PROPOSED] ORDER

that too may bear on the degree of deference the district court shall accord MetLife's decision." *Saffon v. Wells Fargo & Co. Long Term Disability Plan*, --- F.3d---, 2008 WL 80704 *7 (9th Cir. 2008).

6. The same reasons that warrant a court to review an administrator's decision with elevated scrutiny and skepticism, also warrant a finding that the administrator abused its discretion in denying a claim for benefits. *Archuleta v. Reliance Standard Life Ins. co.*, 504 F. Supp. 2d at 884-85.

7. It is an abuse of discretion for an administrator to require "objective" evidence when such evidence is simply not available. Relying on Social Security disability cases, where "individual reactions to pain are subjective and not easily determined by reference to objective measurements," the court explained that if the insurer "is turning down [the claimant's] application for benefits based on [her] failure to produce evidence that simply is not available, that too may bear ... on its ultimate determination as to whether [the claimant] is disabled." *Saffon*, ---F.3d---, 2008 WL 80704, it is an *Id.* at 7. *See also, Prado v. Allied Domecq Sprits and Wine Group Disability Income Policy*, 2008 WL 191985, *9 (N.D. Cal.) ["insurer may not ignore Plaintiff's subjective pain complaints and instead rely solely on objective evidence if evidence of Plaintiff's pain is not available"].

8. It is well settled in the Ninth Circuit that when a conflict exists between plan documents, the language most favorable to the employee controls. It has been noted that "when the plan master document is more favorable to the employee than the SPD ... it controls, despite contrary unambiguous provisions in the SPD." *Bergt v The Retirement Plan for Pilots Employed by Markair, Inc.*, 293 F.3d 1139, 1145 (9th Cir. 2002). In *Bergt*, the court adopted the Fifth Circuit's reasoning that "any burden of uncertainty created by careless or inaccurate drafting of the summary must be placed on those who do the drafting, and who are most able to bear the burden, and not on the individual employee, who is powerless to affect the drafting of the summary or the policy and ill equipped to bear the

PLAINTIFF'S [PROPOSED] FINDINGS OF FACT & CONCLUSIONS OF LAW; [PROPOSED] ORDER

financial hardship that might result from a misleading or confusing document." *Id.* (citing *Hansen v Continental Ins. Co.*, 940 F.2d 971, 982 (5th Cir. 1991)).

9. The Central District itself, interpreting *Bergt*, has held that whichever document is most favorable to the employee will be binding. In *Vasquez v Cargill, Inc.*, 509 F. Supp. 2d 903, 905 (C.D. Cal. 2007), the court found, "[i]f a conflict arises between an ERISA plan master document and a summary plan description more favorable to an employee, the summary plan description controls." Meanwhile, in *Mitchell v Metropolitan Life Ins. Co.*, 523 F. Supp. 2d 1132, the court used the master plan's definition of disability, noting that the plaintiff "claim[ed] he was disabled under the mater plan definition," *id*, at 1144, and that it was "more favorable to" the plaintiff." *Id.* at 1145.

10. It is an abuse of discretion for a plan administrator to consider "accommodations" when determining a claimant's occupational duties. *Saffle v. Sierra Pacific. Power Co.*, 85 F.3d 455, 459 (9th Cir. 1996) [The court reviewed a benefit denial and concluded that the administrator's construction of the term "regular occupation" to include the fact that plaintiff could work with accommodation was an abuse of discretion as it was inconsistent with the plain language of the plan and collapsed the threshold for regular occupation to the standard for any occupation.]

11. It is an abuse of discretion for a plan administrator to deny a claimant's benefits based on its contention that the claimant could perform "sedentary" work rather than her actual occupation. *See Sabatino v. Liberty Life Assurance Co.*, 286 F. Supp. 2d 1221, 1231 (N.D. Cal. 2003) ["Plaintiff was employed as an engineer, which may be a sedentary occupation, but one that requires careful thought and concentration. Simply being able to perform sedentary work does not necessarily enable one to work as an engineer."]

12. Aetna's denial of Ms. Garrison's claim for benefits was an abuse of discretion.

PLAINTIFF'S [PROPOSED] FINDINGS OF FACT & CONCLUSIONS OF LAW; [PROPOSED] ORDER

Garrison v. Aetna
Case No: CV07-3094 JFW(Ex)

# PROOF OF SERVICE

**STATE OF CALIFORNIA, COUNTY OF SAN BERNARDINO**

I am employed in the county of San Bernardino, State of California. I am over the age of 18 and not a party to the within action; my business address is: 3257 East Guasti Road, Suite 300, Ontario, California 91761.

On **February 12, 2008**, I served the foregoing document described as:

### [PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW; [PROPOSED] ORDER THEREON

on all interested parties in this action by placing [ ] the original [ x ]a true copy thereof enclosed in sealed envelopes addressed as follows:

Ronald K. Alberts, Esq.
Shannon L. Victor, Esq.
GORDON & REES
633 W. 5th Street, Ste. 4900
Los Angeles, CA 90071
Phone: (213) 576-5000
Fax: (213) 680-4470

Attorneys for Defendants: AETNA LIFE INSURANCE COMPANY and THE BOEING COMPANY EMPLOYEE HEALTH AND WELFARE BENEFIT PLAN

[ x ]BY MAIL
    I caused such envelope to be deposited in the mail at Ontario, California. The envelope was mailed with postage thereon fully prepaid. I am "readily familiar" with this firm's practice of collection and processing correspondence for mailing. It is deposited with U.S. postal service on that same day in the ordinary course of business. I am aware that on motion of party served, service is presumed invalid if postal cancellation date or postage meter date is more than 1 day after date deposit for mailing in affidavit.

[ ]BY PERSONAL SERVICE
    I caused to be delivered by hand to the above-listed addressees or to the addressees on the list attached hereto. A proof of service executed by the delivery person will be mailed under separate cover.

[ ]BY OVERNIGHT MAIL/COURIER
    To expedite the delivery of the above-named document, said document was sent via overnight courier for next day delivery to the above-listed party.

[ ]BY FACSIMILE ("FAX")
    In addition to the manner of proof of service indicated above, a copy was sent by FAX to the above-listed party.

I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made. I declare under penalty of perjury under the laws of California that the above is true and correct.

Executed on **February 12, 2008**, at Ontario, California.

_____
Catherine Carvalho